**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
         jsmith@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY YOON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LULULEMON USA INC. and QUANTUM METRIC, INC.,<br><br>Defendants. | Case No. 5:20-cv-02439-JWH-SHK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

1   Plaintiff Mary Yoon ("Plaintiff"), individually and on behalf of all others

2   similarly situated, by and through her attorneys, makes the following allegations

3   pursuant to the investigation of her counsel and based upon information and belief,

4   except as to allegations specifically pertaining to herself and her counsel, which are

5   based on personal knowledge.

6                              **<u>NATURE OF THE ACTION</u>**

7   1.      This is a class action suit brought against Defendants Lululemon USA,

8   Inc. ("Lululemon") and Quantum Metric, Inc. ("QM") (collectively, "Defendants")

9   for wiretapping the electronic communications of visitors to Defendant Lululemon's

10  website, Lululemon.com (the "Website").  The wiretaps, which are embedded in the

11  computer code on the Website, are used by Defendants to secretly observe and record

12  website visitors' keystrokes, mouse clicks,[1] shipping and billing address, and other

13  electronic communications, including the entry of Personally Identifiable Information

14  ("PII"), in real time.  By doing so, Defendants have violated the California Invasion

15  of Privacy Act ("CIPA"), Cal. Penal Code §§ 631 and 635, invaded Plaintiff's and

16  Class Members' privacy rights in violation of the California Constitution, and

17  violated 18 U.S.C § 2512.

18  2.      In or about April 2020, Ms. Yoon visited the Website.  During the visit,

19  Defendants recorded Plaintiff's electronic communications in real time, including

20  Plaintiff's mouse clicks, keystrokes, scrolls, mouse movements, shipping and billing

21  address, and information about web pages viewed on the Website.

22  3.      Plaintiff brings this action on behalf of herself and a class of all persons

23  whose electronic communications were intercepted through the use of Defendants'

24  wiretap on the Website.

25                                  **<u>THE PARTIES</u>**

26  4.      Plaintiff Mary Yoon is a resident of Corona, California and has an intent

27

28

---

[1] As used herein, the term "mouse clicks" also refers to "touch gestures" such as the "tap," "swipe," and similar gestures used on touchscreen devices.

1    to remain there, and is therefore a domiciliary of California.  In or about April 2020,

2    prior to the filing of this lawsuit, Ms. Yoon visited the Website and made a purchase.

3    Ms. Yoon was in Corona when she visited the website.  While on the website, Ms.

4    Yoon did the kinds of things people typically do when purchasing items online, such

5    as clicking on links to webpages of interest, scrolling through pages, using dropdown

6    menus, and using the website search tool.  During the visit, Ms. Yoon's keystrokes,

7    mouse clicks, scrolls, information about web pages viewed, and other electronic

8    communications were intercepted in real time and were disclosed to Defendants

9    Lululemon and QM through the wiretap.  Ms. Yoon was unaware at the time that her

10   keystrokes, mouse clicks, and other electronic communications, including the

11   information described above, were being intercepted in real-time and would be

12   disclosed to QM, nor did Ms. Yoon consent to the same.

13        5.      Defendant Lululemon, USA Inc. is a company incorporated under the

14   laws of Nevada with its principal place of business at 1818 Cornwall Avenue,

15   Vancouver, British Columbia, Canada V6J 1C7.

16        6.      Lululemon does business throughout California and the entire United

17   States.

18        7.      Lululemon USA, Inc. owns and operates the Website.

19        8.      Defendant Quantum Metric, Inc. is a Delaware corporation with its

20   principal place of business at 10807 New Allegiance Drive, Suite 155, Colorado

21   Springs, Colorado 80921.

22        9.      QM is a marketing software-as-a-service ("SaaS") company.

23        10.     QM provides a feature called "Session Replay," which is at issue here

24   and described more fully below.  At all relevant times here, Lululemon has used

25   QM's "Session Replay" product on the Website.

26                          **JURISDICTION AND VENUE**

27        11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.

28   § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all

1  members of the proposed class are in excess of $5,000,000.00, exclusive of interest

2  and costs, and at least one member of the proposed class is citizen of state different

3  from at least one Defendant.

4      12.   This Court has personal jurisdiction over Defendants because each of the

5  Defendants have purposefully availed themselves of the laws and benefits of doing

6  business in this State, and Plaintiff's claims arise out of each of the Defendants'

7  forum-related activities.  Furthermore, a substantial portion of the events giving rise

8  to Plaintiff's claims occurred in this District.

9      13.   Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this

10  action because a substantial part of the events, omissions, and acts giving rise to the

11  claims herein occurred in this District.

12      14.   Both Defendants also purposefully directed their activities at California,

13  and the wiretapping at issue here arises from or relates to Defendants' activities.  As

14  alleged more fully below, Defendants intentionally installed the wiretap at issue here

15  on webmd.com.  Defendant QM purposefully intercepted electronic transmissions

16  from users of the Website, and Lululemon purposefully aided and abetted QM's

17  conduct.  The conduct also was expressly aimed at California residents.  California is

18  the largest market in the United States—indeed, if California were its own nation,

19  California would have the fifth largest economy in the world.  Defendants knew that

20  a significant number of Californians would visit Lululemon's website, because they

21  form a significant portion of Lululemon's target market.  By intercepting the

22  transmissions of the Website's users, Defendants targeted their wrongful conduct at

23  customers, some of whom Defendants knew, at least constructively, were residents of

24  California.  It was foreseeable that Defendants' interceptions and wiretapping would

25  harm Plaintiff and similarly-situated individuals, and that at least some of this harm

26  would occur in California—where Defendants knew many customers and prospective

27  customers resided.

28      15.   The Website has a national viewership and scope, which appeals to, and

1   profits from, an audience in one particular state above most others:  California.

2   Because of the substantial California market, Defendants anticipated, desired, and

3   achieved a substantial California viewer base.

## STATEMENT OF FACTS

**I.     Overview Of The Wiretaps**

6          16.     Defendant QM develops a software of the same name.

7          17.     One of QM's features is called "Session Replay," which purports to help

8   businesses improve their website design and customer experience.

9          18.     Session Replay captures internet communications between a website

10   user and a website in real-time, while those communications are in transit.  These

11   communications include mouse movements, mouse clicks, keystrokes, scrolls, and

12   web pages a visitor looks at.  QM says that Session Replay allows companies to "to

13   pull up any user who had visited [a] website and watch their journey as if [the

14   company] was standing over their shoulder."  A company can "see every click, every

15   tap and exactly what the website responded with – an error, a success message, or

16   nothing."

17          19.     Session replay technologies work by using "embedded snippets of code

18   … [that] watch and record a visitor's every move on a website, in real time."[2]

19          20.     Indeed, as QM's patent makes clear, it is able to "aggregate data, in real-

20   time from one or more client devices … about interaction with and operation of a

21   website."  *See* ECF No. 19, Ex. A, at 16; *see also id.* at 23 ("The information may be

22   provided in real-time along with the document that is being monitored."); ECF No.

23   19, Ex. B, at 34 ("We give you real-time visibility into all behavioral, technical, and

24   segment data.").

25          21.     QM says its Session Replay feature "capture[s] all the metadata behind

26   the replay— like user platform, API calls, and network details—as well as dozens of

27

28   [2] Tomas Foltyn, *What's the Deal with Session-Replay Scripts?*, WELIVESECURITY, Apr. 20, 2018, https://www.welivesecurity.com/2018/04/20/whats-deal-session-replay-scripts/.

out of the box events and errors, plus the custom ones you'll configure in our UI.  In the event that you need to collect anything else, Quantum Metric's event engine can capture **just about anything that you need**."

22.     The patent also states that QM's software "can monitor changes to the DOM [*i.e.*, interactions with the website] and user interactions, such as mouse clicks, mouse movements, scrolling, and keyboard entry to relay action and changes through the initiation of additional browser requests to the web server."  ECF No. 19, Ex. C, at 56; *see also* ECF No. 19, Ex. C, at 58 ("[T]he capture agent may also receive user interaction events, such as keyboard entry, document resize, orientation changes, scroll events, mouse movements, or mouse clicks.").

23.     QM can even "capture and follow users['] sessions across devices so long as there's a user identified such as an email address or unique ID."  ECF No. 19, Ex. B, at 31.

24.     QM's software can "use various combinations of IP address, referrer, session cookies, browser identifier, and operating system type to link web documents together into a session for replay."  ECF No. 19, Ex. C, at 57.

25.     QM's patent refers to "monitoring" website "interactions" 206 times. Even the title of the patent refers to "monitoring" websites.

26.     QM's patent also refers to monitoring website interactions in "real-time" 5 times.  *See*, *e.g.*, ECF No. 19, Ex. A, at 15 ("The present disclosure relates generally to capturing dynamic real-time changes to a web document within a browser"); *id.* at 23 ("The information may be provided in real-time along with a document that is being monitored.").

27.     The below screenshot shows how the Session Replay interface works, and shows such electronic communications as what a user clicked on, when a user reloaded a page, and where a user's mouse pointer is located:

//

//



28.    QM's website includes a marketing video that discusses the Session Replay feature.  The video touts that companies can "[s]ee actual customer interactions."  The marketing presentation then shows a mock mobile user interacting with a website.  The video shows what items the user viewed and added to their cart:

//

//

//

//

//

//

//

//

//

//

//

//

//



29.     The marketing presentation then proceeds to show where exactly the mock user clicked on the website:

//

//

//

//

//

//

//

//

//

//

//

30.    QM's patent elaborates on the above chain of events.  As the patent states, "a web session may begin with a user on a web browser initiating the browser request for a document from computer system."  ECF No. 19, Ex. A, at 19.

31.    A website "may include [and, in this case, does include] an operator monitor [QM] that monitors operation of a website."  The "[o]perator monitor may **monitor and/or intercept communications** between a client device and" the website."  ECF No. 19, Ex. A, at 19 (Emphasis added).

32.    The operator monitor employs a "capture engine" that "can monitor changes to the [website] and user interactions, such as mouse clicks, mouse movements, scrolling, and keyboard entry to relay action and changes through the initiation of additional browser requests to the web server."  ECF No. 19, Ex. C, at 56.

33.    This process is illustrated in the below diagram, where a user submits a request (in the form of website interactions) to a web server.  But, along the way, the "server-side capture engine" (QM's software) intercepts those requests:



ECF No. 19, Ex. C, at 42.

34.    In short, QM's software "monitor[s], by the event detection system, communications between the client device and a web server providing web content to the client device." *Id.* at 28; *see also id.* at 29 (QM's software "monitor[s] one or more requests that are related to the electronic document and that were communicated from the client device to the web server that hosts the website.").

35.    QM's code is not a cookie at all, much less a run-of-the-mill cookie. Common cookies that consumers might be familiar with do not engage in session recording or all of the features described above.  QM's code does far more than simply track where a visitor went on the internet, and its functionality is not limited to

aggregate data.  Rather, as a 2017 study by Princeton University researchers—which examined a number of QM's competitors—noted, "unlike typical analytics services that provide aggregate statistics, these scripts are intended for the recording and playback of individual browsing sessions, as if someone is looking over your shoulder."[3]

36.    Technology like QM's Session Replay feature is not only highly intrusive, but dangerous.  The 2017 study by Princeton University researchers found that session recording technologies were collecting sensitive user information such as passwords and credit card numbers.  The research notes that this wasn't simply the result of a bug, but rather insecure practices.  Thus, session recording technologies such as QM's can leave users vulnerable to data leaks and the harm resulting therefrom.

37.    Session recording technology like QM's is relatively new.  It is not ubiquitous, routine Internet activity.  The Internet functioned for many years without session recording technology, and the Internet can and will continue to operate just fine without session recording technology.

38.    QM's business model involves entering into voluntary partnerships with various companies and providing their software to their partners.

39.    One of QM's partners is Defendant Lululemon.

40.    Lululemon utilizes QM's software on the Website.

41.    Lululemon knows that QM's software captures the keystrokes, mouse clicks and other communications of visitors to its website, and pays QM to supply that information.

42.    In fact, Lululemon admits that it spies on users accessing the Website

---

[3] Steven Englehardt et al., *No Boundaries: Exfiltration of Personal Data by Session-Replay Scripts*, FREEDOM TO TINKER, Nov. 15, 2017, https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

1    using QM's software.  For instance, after a user views a product on the Website,

2    Lululemon will send a user an email stating that Lululemon "see[s] you [the user]

3    looking":



19        43.    Pursuant to an agreement with QM, Lululemon enabled QM's software

20    by voluntarily embedding QM's software code on the Website.

21        44.    As currently deployed, QM's software, as employed by Lululemon,

22    functions as a wiretap.

23    **II.**    **Defendants Wiretapped Plaintiff's Electronic Communications**

24        45.    In or about April 2020, Ms. Yoon visited Lululemon.com and made a

25    purchase.

26        46.    During that visit, and upon information and belief, the Session Replay

27    feature in QM's software created a video capturing each of Plaintiff's keystrokes,

28    mouse clicks, pages viewed, and shipping and billing information on the Website.

1   The QM wiretap also captured the date and time of the visit, the duration of the visit,

2   Plaintiff's IP address, her location at the time of the visit, her browser type, and the

3   operating system on her device.

4       47.   QM's recording of keystrokes, mouse clicks, data entry, and other

5   electronic communications begins the moment a user accesses or interacts with the

6   Website.

7       48.   When users access the Website and make a purchase, they enter their

8   PII.  QM's software captures these electronic communications throughout each step

9   of the process.  Even if users do not make a purchase, the Website nonetheless

10  captures users' electronic communications throughout his or her visit.

11      49.   QM's software captures, among other things:

12          (a)   The user's mouse clicks;

13          (b)   The user's keystrokes;

14          (c)   The user's email address;

15          (d)   The user's shipping and billing address;

16          (e)   The user's IP address;

17          (f)   The user's their location at the time of the visit; and

18          (g)   The user's browser type and the operating system on their devices

19      50.   QM claims that it "encrypts" shipping and billing addresses, and that it

20  does not capture payment card data.  But those claims are dubious.  As the 2017

21  study by Princeton University researchers notes, "[a]utomated redaction is imperfect;

22  fields are redacted by input element type or heuristics, which may not always match

23  the implementation used by publishers."

24      51.   For example, one of QM's competitors "redacts credit card fields with

25  the 'autocomplete' attribute set to 'cc-number,' but will collect any credit card

26  numbers included in forms without this attribute."

27      52.   Further, to properly redact any sensitive information, "a publisher will

28  need to actively audit every input element to determine if it contains personal data.

1  This is complicated, error prone and costly, especially as a site or the underlying web

2  application code changes over time."

3  53.   In addition, "session recording companies expect sites to manually label

4  all personally identifying information included in a rendered page.  Sensitive user

5  data has a number of avenues to end up in recordings, and small leaks over several

6  pages can lead to a large accumulation of personal data in a single session recording."

7  54.   Crucially, Defendant Lululemon does not ask users, including Plaintiff,

8  whether they consent to being wiretapped by QM.  Users are never actively told that

9  their electronic communications are being wiretapped by QM.

10  55.   Lululemon's Privacy Policy did not disclose the wiretapping for several

11  reasons.  First, to the extent Lululemon's home page contained a link to the Privacy

12  Policy, it was buried at the very bottom of the webpage in tiny, 7.5 non-contrasting

13  font that was designed to be unobtrusive and easy to overlook.

14  56.   Even at the checkout page, the hyperlink to the Privacy Policy remains

15  buried at the very bottom of the webpage in tiny, 7.5 non-contrasting font that was

16  designed to be unobtrusive and easy to overlook, and is located on a cluttered

17  checkout page.  Nor are users ever told that by clicking on the "Place Order" button

18  or browsing the Website:

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //



ECF No. 19, Ex. E, at 72 (stating in tiny font that a user may "learn more" by viewing the Privacy Policy, not that they are agreeing to the Privacy Policy in any manner).

57.     In fact, users are *never* asked whether they assent to Lululemon's Privacy Policy throughout their time on the Website.

58.     Regardless, by the time users reach Lululemon's checkout page,

1  Lululemon and QM had already recorded their website communications, *i.e.*, any

2  purported disclosure was made *after* the wiretap had already begun.

3      59.    Moreover, Lululemon states in its Privacy Policy that "others" *may* use

4  "cookies, web beacons, device identifiers, and other tracking technologies."  But this

5  does not disclose the wiretapping for several reasons.  First, these "other entities" are

6  not defined in the Privacy Policy.  Second, disclosing that others have the *capacity* to

7  monitor certain information is not the same as disclosing that others *do in fact* collect

8  mouse clicks, keystrokes, and other communications in real time.  And third, a

9  reasonable consumer might suspect that Lululemon keeps track of what that

10  consumer purchases after the fact for marketing purposes.  But a reasonable

11  consumer would *not* expect to have their mouse clicks, keystrokes, and other

12  communications monitored by a third party in real time and conglomerated into a

13  video recording, whether or not that user made a purchase.  Indeed, as the 2017

14  Princeton University study researchers recognized, "the extent of data collected by

15  these services **far exceeds user expectations** [1]; text typed into forms is collected

16  before the user submits the form, and precise mouse movements are saved, all

17  without any visual indication to the user. This data can't reasonably be expected to be

18  kept anonymous."  That Lululemon groups "tracking technologies" with "cookies,

19  web beacons, [and] device identifiers" also makes the phrase "tracking technologies"

20  seem innocuous and commonplace.  But session replay technologies are neither

21  common nor innocuous.

22      60.    Lululemon does disclose in its Privacy Policy that it employs "[v]ideo

23  monitoring and recording" in its retail stores.  But Lululemon does not disclose the

24  same for recording website activities.

25      61.    For these reasons and more, users do not agree to be wiretapped even if

26  they agree to the Privacy Policy.

27      62.    Neither Plaintiff nor any Class member consented to being wiretapped

28  on the Website, nor to have their communications recorded and shared with QM.

1  Any purported consent that was obtained was ineffective because (i) the wiretapping

2  began from the moment Plaintiff and Class members accessed the Website; (ii) the

3  Privacy Policy did not disclose the wiretapping or QM; and (iii) the hyperlink to the

4  Privacy Policy is inconspicuous and therefore insufficient to provide notice.

5  ## **CLASS ACTION ALLEGATIONS**

6  63.    Plaintiff seeks to represent a class of all residents of the United States

7  who visited the Website, and whose electronic communications were intercepted or

8  recorded by QM (the "Class").  Plaintiff reserves the right to modify the class

9  definition as appropriate based on further investigation and discovery obtained in the

10 case.

11 64.    Plaintiff also seeks to represent a subclass of all California residents who

12 visited the Website, and whose electronic communications were intercepted or

13 recorded by QM (the "Subclass").  Plaintiff reserves the right to modify the class

14 definition as appropriate based on further investigation and discovery obtained in the

15 case.

16 65.    The Class and Subclass shall collectively be referred to as the "Classes."

17 66.    Members of the Classes are so numerous that their individual joinder

18 herein is impracticable.  On information and belief, members of the Classes number

19 in the thousands.  The precise number of members of the Classes and their identities

20 are unknown to Plaintiff at this time but may be determined through discovery.

21 Members of the Classes may be notified of the pendency of this action by mail and/or

22 publication through the distribution records of Defendants.

23 67.    Common questions of law and fact exist as to all members of the Classes

24 and predominate over questions affecting only individual Classes members.

25 Common legal and factual questions include, but are not limited to, whether

26 Defendants have violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal

27 Code §§ 631 635, invaded Plaintiff's privacy rights in violation of the California

28 Constitution, and violated certain provisions of the Federal Wiretap Act (specifically

18 U.S.C. § 2512); and whether class members are entitled to actual and/or statutory damages for the aforementioned violations.

68.     The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other members of the Classes, visited the Website and had her electronic communications intercepted and disclosed to QM through the use of QM's wiretaps.

69.     Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the members of the Classes she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

70.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

71.     Plaintiff brings all claims in this action individually and on behalf of members of the Classes against Defendants.

## COUNT I
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 631

72.  Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

73.  Plaintiff brings this claim individually and on behalf of the members of the proposed Subclass against Defendants.

74.  To establish liability under section 631(a), Plaintiff need only establish that Defendants, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

75.  Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*,

1  2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new

2  technologies" and must be construed broadly to effectuate its remedial purpose of

3  protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal.

4  Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc.*

5  *Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of

6  CIPA and common law privacy claims based on Facebook's collection of consumers'

7  Internet browsing history).

8    76. QM's software, including its Session Replay feature, is a "machine,

9  instrument, contrivance, or … other manner" used to engage in the prohibited

10  conduct at issue here.

11    77. At all relevant times, by using QM's technology, Defendants

12  intentionally tapped, electrically or otherwise, the lines of internet communication

13  between Plaintiff and Subclass members on the one hand, and Lululemon's Website

14  on the other hand.

15    78. At all relevant times, by using QM's technology, Defendants willfully

16  and without the consent of all parties to the communication, or in any unauthorized

17  manner, read or attempted to read or learn the contents or meaning of electronic

18  communications of Plaintiff and putative Subclass members, while the electronic

19  communications were in transit or passing over any wire, line or cable or were being

20  sent from or received at any place within California.

21    79. As QM's patent makes clear, "[t]he information may be provided in real-

22  time along with the document that is being monitored."  ECF No. 19, Ex. A, at 23;

23  *see also* ECF No. 19, Ex. B, at 34 ("We give you real-time visibility into all

24  behavioral, technical, and segment data.").

25    80. Defendants aided, agreed with, and conspired with each other to

26  implement QM's technology and to accomplish the wrongful conduct at issue here.

27  In addition, Lululemon employed QM to accomplish the wrongful conduct at issue

28  here.

81.   Plaintiff and Subclass members did not consent to any of Defendants' actions in implementing QM's wiretaps on the Website.  Nor have Plaintiff nor Subclass members consented to Defendants' intentional access, interception, reading, learning, recording, and collection of Plaintiff and Subclass members' electronic communications.

82.   The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

83.   Unless enjoined, Defendants will continue to commit the illegal acts alleged here.  Plaintiff continue to be at risk because she frequently uses the internet to shop for clothes, and she continues to desire to use the internet for that purpose. Defendant QM provides its software, including the Session Replay feature, to many other website operators who offer a wide array of services.  For many websites that Plaintiff may or is likely to visit in the future, she has no practical way to know if her website communications will be monitored or recorded by QM.

84.   Plaintiff and Subclass members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 635**

85.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

86.   Plaintiff brings this claim individually and on behalf of the members of the proposed Subclass against Defendants.

87.   California Penal Code § 635 provides, in pertinent part:

> Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily

or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6 , shall be punished by a fine not exceeding two thousand five hundred dollars.

88.    At all relevant times, by implementing QM's wiretaps, each Defendant intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished a wiretap device that is primarily or exclusively designed or intended for eavesdropping upon the communication of another.

89.    QM's code is a "device" that is "primarily or exclusively designed" for eavesdropping.  That is, the QM's code is designed to gather PII, including keystrokes, mouse clicks, and other electronic communications.

90.    Plaintiff and Subclass members did not consent to any of Defendants' actions in implementing QM's wiretaps.

91.    Unless enjoined, Defendants will continue to commit the illegal acts alleged here.  Plaintiff continues to be at risk because she frequently uses the internet to shop for clothes, and she continues to desire to use the internet for that purpose. Defendant QM provides its software, including the Session Replay feature, to many other website operators who offer a wide array of services.  For many websites that Plaintiff may or is likely to visit in the future, she has no practical way to know if her website communications will be monitored or recorded by QM.

92.    Plaintiff and Subclass members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

## COUNT III
### Invasion Of Privacy Under California's Constitution

93.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

94.     Plaintiff brings this claim individually and on behalf of the members of the proposed Subclass against Defendants.

95.     Plaintiff and Subclass members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential PII; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various Internet sites without being subjected to wiretaps without Plaintiff's and Subclass members' knowledge or consent.

96.     At all relevant times, by implementing QM's wiretaps on Lululemon's Websites, each Defendant intentionally invaded Plaintiff's and Subclass members' privacy rights under the California Constitution, and procured the other Defendant to do so.

97.     Plaintiff and Subclass members had a reasonable expectation that their PII and other data would remain confidential and that Defendants would not install wiretaps on the Website.

98.     Plaintiff and Subclass members did not consent to any of Defendants' actions in implementing QM's wiretaps on the Website.

99.     This invasion of privacy is serious in nature, scope and impact.

100.   This invasion of privacy alleged here constitutes an egregious breach of the social norms underlying the privacy right.

101.   Plaintiff and Subclass members seek all relief available for invasion of privacy claims under California's Constitution.

## COUNT IV
### Violation Of The Federal Wiretap Act, 18 U.S.C. § 2512

102. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

103. Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendants.

104. 18 U.S.C. § 2512, in pertinent part, holds "any person" liable "who intentionally":

> manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce.

18 U.S.C. § 2512(1)(b).

105. Defendant QM's "Session Replay" feature is an "electronic, mechanical, or other device" as defined by 18 U.S.C. § 2510(5), and is primarily useful for the purpose of the surreptitious interception of electronic communications.

106. Defendant QM manufactured, possessed, marketed, and sold its software, including the Session Replay feature, with knowledge that it would primarily be used to illegally intercept electronic communications.

107. Defendant Lululemon possessed QM's software, including the Session Replay feature, with knowledge that it would primarily be used to illegally intercept electronic communications.

108. Defendants played an active role in using QM's Session Replay feature to intercept, disclose, and intentionally use the electronic communications of Plaintiff and members of the Classes. Specifically, Defendants installed QM's software on Lululemon's Website, monitored and recorded electronic communications on the Website, compiled the communications into a video recording, and maintained the surreptitious recordings without user consent.

109.   Plaintiff and members did of the Classes not consent to any of Defendant QM's actions.

110.   Defendants conduct violated 18 U.S.C. § 2512 and therefore gives rise to a claim under 18 U.S.C. § 2520.

111.   Pursuant to 18 U.S.C. § 2520, Plaintiff and the Classes are entitled to the greater of actual damages or statutory damages or not less than $100 a day for each day of violation or $10,000, whichever is greater.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)   For an order certifying the Classes under Rule 23 and naming Plaintiff as the representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)   For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)   For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and

(h)   For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

1

## **DEMAND FOR TRIAL BY JURY**

2      Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by

3  jury of all issues so triable.

4

5  Dated:  February 25, 2021          Respectfully submitted,

6                                      **BURSOR & FISHER, P.A.**

7                                      By:  ___*/s/ Joel D. Smith*___

8                                             Joel D. Smith

9                                      L. Timothy Fisher (State Bar No. 191626)
                                        Joel D. Smith (State Bar No. 244902)
10                                     1990 North California Boulevard, Suite 940
                                        Walnut Creek, CA  94596
11                                     Telephone: (925) 300-4455
                                        Facsimile:  (925) 407-2700
12                                     E-Mail: ltfisher@bursor.com
                                                jsmith@bursor.com
13

14                                     *Attorneys for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28