1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
　　　　jsmith@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY YOON, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　Plaintiff,<br>　v.<br><br>LULULEMON USA INC. and QUANTUM METRIC, INC.,<br><br>　　　　　　　　　　Defendants. | Case No. 5:20-cv-02439-JWH-SHK<br><br>**OPPOSITION TO MOTION TO DISMISS**<br><br>Date:　　May 28, 2021<br>Time:　　9:00 a.m.<br>Ctrm:　　2<br>Judge:　　Hon. John W. Holcomb |

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................... 1

I.   Plaintiff Sufficiently Alleges A Violation Of § 631(a) ........................... 1

   A.   QM Was Not A Party To The Communications ........................... 1

   B.   Lululemon Is Liable For Enabling QM's Wiretapping ................................................................................ 7

   C.   Plaintiffs' Website Interactions Are "Communications" Under *Moosejaw*, *In re Facebook*, and *In re Zynga* ........................................ 9

   D.   QM's Software Intercepted Plaintiff's Electronic Communications "In Transit" ........................................ 11

   E.   Lululemon's Privacy Policy Does Not Support Dismissal ........................................................................... 16

      1.   Plaintiff Was Wiretapped Before The Hyperlink To The Privacy Policy Appeared On Plaintiff's Screen ................................ 16

      2.   The Privacy Policy Arguments Fail Under *Nguyen* ................................................................. 18

      3.   At Best, Whether The Privacy Policy Discloses The Wiretapping Is A Question Of Fact ................................................................. 20

II.  Plaintiff States A Claim For Violations Of CIPA § 635 And Federal Wiretap Act § 2512 ......................................... 23

III. Plaintiff States A Claim For Invasion Of Privacy ............................... 28

   A.   Dismissal Of The Invasion Of Privacy Claim Would Be Reversible Error Under *In re Facebook* ................... 28

   B.   Defendants' Arguments And Authorities Do Not Support Dismissal ..................................................... 30

IV.  *Khoja* And F.R.E. 208 Require Denial Of Defendants' Request For Judicial Notice ......................................... 33

CONCLUSION ............................................................................................ 35

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ades v. Omni Hotels Mgmt. Corp.,*
  46 F. Supp. 3d 999 (C.D. Cal. 2014) ...................................................28

*Berman v. Freedom Financial Network, LLC,*
  2020 WL 5210912 (N.D. Cal. Sept. 1, 2020) ........................................20

*Bonnichsen v. United States,*
  367 F.3d 864 (9th Cir. 2004) ...................................................................8

*Brown v. Google LLC,*
  2021 WL 949372 (N.D. Cal. Mar. 12, 2021) .........................................22

*Bunnell v. Motion Picture Ass'n of Am.,*
  567 F. Supp. 2d 1148 (C.D. Cal. 2007) ...........................................15, 16

*Byrd v. Aaron's, Inc.,*
  2012 WL 12887775 (W.D. Pa. 2012) .....................................................13

*Cabral v. Supple, LLC,*
  2012 WL 12895825 (C.D. Cal. Oct. 3, 2012) ........................................33

*Campbell v. Facebook Inc.,*
  77 F. Supp. 3d 836 (N.D. Cal. 2014) ........................................5, 22, 31

*Casey v. Proctor,*
  59 Cal. 2d 97 (1963) ...............................................................................17

*Colgate v. JUUL Labs, Inc.,*
  402 F. Supp. 3d 728 (N.D. Cal. 2019) ...................................................19

*Cothron v. White Castle System, Inc.,*
  467 F. Supp. 3d 604 (N.D. Ill. 2020) .....................................................18

*Cullinane v. Uber Tech., Inc.,*
  893 F.3d 53 (1st Cir. 2018)......................................................................19

*Dufour v. Allen,*
  748 F. App'x 150 (9th Cir. 2019) ...........................................................21

*ENTTech Media Grp. LLC v. Okularity, Inc.*,
  2021 WL 916307 (C.D. Cal. Mar. 10, 2021) ........................................5, 31

*Farrell v. Boeing Employees Credit Union*,
  761 F. App'x 682 (9th Cir. 2019) ...........................................................34

*Fleury v. Union Pac. R.R. Co.*,
  2021 WL 1124309 (N.D. Ill. Mar. 24, 2021) ...........................................17

*Foglestrom v. Lamps Plus, Inc.*,
  195 Cal. App. 4th 986 (2011) .................................................................32

*Franco v. Greystone Ridge Condominium*,
  39 Cal. App. 5th 221 (2019) ...................................................................18

*Fredenburg v. City of Fremont*,
  119 Cal. App. 4th 408 (2008) .................................................................33

*Gollehon v. Mahoney*,
  626 F.3d 1019 (9th Cir. 2010) ................................................................27

*Graham v. Noom, Inc.*,
  2021 WL 1312765 (N.D. Cal. Apr. 8, 2021) ...........................................5, 6

*Harris v. Harris*,
  935 F.3d 670 (9th Cir. 2019) ....................................................................8

*Heeger v. Facebook, Inc.*,
  2020 WL 7664459 (N.D. Cal. Dec. 24, 2020) .....................................32, 33

*Hill v. Nat'l Collegiate Athletic Ass'n*,
  7 Cal. 4th 1 (1994) ...........................................................................30, 33

*In re Carrier IQ, Inc.*,
  78 F. Supp. 3d 1051, (N.D. Cal. 2015) ............................................. Passim

*In re Facebook Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) ........................................................... Passim

*In re Google Assistant Priv. Litig.*,
  457 F. Supp. 3d 797 (N.D. Cal. 2020) .................................................21, 29

*In re Google Inc.*,
  2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .................................................. Passim

*In re Google Location Hist. Litig.*,
  428 F. Supp. 3d 185 (N.D. Cal. 2019) ................................................................ 33

*In re Google, Inc. Privacy Policy Litig.*,
  58 F. Supp. 3d 968 (N.D. Cal. 2014) ................................................................. 33

*In re iPhone Application Litig.*,
  844 F. Supp. 2d 1040 (N.D. Cal. June 12, 2012) ......................................... 21, 33

*In re Lenovo Adware Litig.*,
  2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ....................................................... 8

*In re Pharmatrak, Inc.*,
  329 F.3d 9 (1st Cir. 2003) ................................................................................ 10

*In re Vizio, Inc. Consumer Priv. Litig.*,
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) .............................................................. 30

*In re Yahoo Mail Litig.*,
  7 F. Supp. 3d 1016 (N.D. Cal. 2014) ................................................................. 33

*In re Zynga Privacy Litig.*,
  750 F.3d 1098, 1107 (9th Cir. 2014) (9th Cir. 2014) ...................................... 10, 11

*In re: Zoom Video Commc'n's Inc. Privacy Litig.*,
  2021 WL 930623 (N.D. Cal. Mar. 11, 2021) ....................................................... 33

*Ion Equip. Corp. v. Nelson*,
  110 Cal. App. 3d 868 (1980) ............................................................................ 24

*Javier v. Assurance IQ, LLC*,
  2021 WL 940319 (N.D. Cal. Mar. 9, 2021) .................................................... 18, 20

*Kauders v. Uber Techs., Inc.*,
  2019 WL 510568 (Mass. Super. Ct. Jan. 3, 2019) ............................................... 17

*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.*,
  133 Cal. App. 4th 26 (2005) ............................................................................ 28

*Keck v. Bank of Am.*,
   2008 WL 1743445 (N.D. Cal. Apr. 15, 2008) ........................................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ...........................................................33, 34, 35

*Koala v. Khosla*,
   931 F.3d 887 (9th Cir. 2019) ...........................................................................11

*Konop v. Hawaiian Airlines, Inc.*,
   302 F.3d 868 (9th Cir. 2002) .....................................................................13, 14

*Leaf v. City of San Mateo*,
   104 Cal. App. 3d 398 (1980) ...........................................................................17

*London v. New Albertson's Inc.*,
   2008 WL 4492642 (S.D. Cal. Sept. 30, 2008) ...................................................33

*Lopez v. Apple, Inc.*,
   2021 WL 823122 (N.D. Cal. Feb. 10, 2021) .......................................................3

*Luis v. Zang*,
   833 F.3d 619 (6th Cir. 2016) ..................................................................... Passim

*Maghen v. Quicken Loans, Inc.*,
   2014 WL 12586447 (C.D. Cal. Oct. 28, 2014).....................................................28

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008) ...........................................................................16

*Maree v. Deutsche Lufthansa AG*,
   2021 WL 267853 (C.D. Cal. Jan. 26, 2021) ......................................................19

*Mastronardo v. Mastronardo*,
   2018 WL 495246 (Pa. Super. Ct. Jan. 22, 2018).................................................17

*Matera v. Google Inc.*,
   2016 WL 5339806 (N.D. Cal. Sept. 23, 2016) .....................................................3

*Matera v. Google Inc.*,
   2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) .............................................26, 27

*McAdory v. M.N.S. & Assocs., LLC,*
   952 F.3d 1089 (9th Cir. 2020) ..................................................................6, 7, 10, 15

*McCoy v. Alphabet, Inc.,*
   2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .......................................................22, 33

*Membrila v. Receivables Performance Mgmt., LLC,*
   2010 WL 1407274 (S.D. Cal. Apr. 6, 2010).............................................................4

*Moreno v. San Francisco Bay Area Rapid Trans. Dist.,*
   2017 WL 6387764 (N.D. Cal. Dec. 14, 2017)........................................................19

*Motley v. ContextLogic, Inc.,*
   2018 WL 5906079 (N.D. Cal. Nov. 9, 2018) ..........................................................20

*Nguyen v. Barnes & Noble Inc.,*
   763 F.3d 1171 (9th Cir. 2014) ..........................................................................19, 20

*Opperman v. Path, Inc.,*
   87 F. Supp. 3d 1018 (N.D. Cal. 2014) .............................................................29, 32

*Opperman v. Path, Inc.,*
   205 F. Supp. 3d 1064 (N.D. Cal. 2016) ........................................................ Passim

*People v. Snyder,*
   22 Cal. 4th 304 (2000) ...........................................................................................8

*People v. Windham,*
   145 Cal. App. 4th 881 (Cal. Ct. App. 2006)............................................................3

*Plevy v. Haggerty,*
   38 F.Supp.2d 816 (C.D. Cal. 1998) ......................................................................34

*Powell v. Union Pac. Railroad Co.,*
   864 F. Supp. 2d 949 (E.D. Cal. Mar. 31, 2012)......................................................4

*Rainsy v. Facebook, Inc.,*
   311 F. Supp. 3d 1101 (N.D. Cal. 2018) .................................................................10

*Revitch v. New Moosejaw, LLC,*
   2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ................................................ Passim

*Ribas v. Clark*,
   38 Cal. 3d 355 (1985) ...........................................................................2, 8

*Rogers v. Ulrich*,
   52 Cal. App. 3d 894 (1975) ........................................................................4

*Romero v. Securus Techs., Inc.*,
   216 F. Supp. 3d 1078 (S.D. Cal. 2016) ...................................................25

*Roney v. Miller*,
   705 F. App'x 670 (9th Cir. 2017) ...........................................................36

*Russell v. Citigroup, Inc.*,
   748 F.3d 677 (6th Cir. 2014) ..................................................................18

*S.D. v. Hytto Ltd.*,
   2019 WL 8333519 (N.D. Cal. May 15, 2019) .............................3, 10, 11

*Salgado v. Carrows Rest., Inc.*,
   33 Cal. App. 5th 356 (2019) ...................................................................18

*Santa Monica Nativity Scenes Cmte. v. City of Santa Monica*,
   784 F.3d 1286 (9th Cir. 2015) ................................................................34

*Sheski v. Shopify (USA) Inc.*,
   2020 WL 2474421 (N.D. Cal. May 13, 2020) ........................................33

*Smith v. LoanMe*,
   2021 WL 1217873 (Cal. April 1, 2021) .......................................2, 26, 27

*Spokeo, Inc. v. Robbins*,
   136 S. Ct. 5140 (2016) (2016) ................................................................25

*Theofel v. Farey-Jones*,
   359 F.3d 1066 (9th Cir. 2004) ................................................................15

*United States v. Arreguin*,
   453 F. App'x 678 (9th Cir. 2011) ...........................................................17

*United States v. Eady*,
   648 F. App'x 188 (3rd Cir. 2016) .............................................................3

*United States v. Forrester,*
  512 F.3d 500 (9th Cir. 2008) ......................................................................10

*United States v. Johnson,*
  875 F.3d 1265 (9th Cir. 2017) ....................................................................17

*United States v. LeCoe,*
  936 F.2d 398 (9th Cir. 1991) ......................................................................27

*United States v. Monday,*
  614 F.3d 983 (9th Cir. 2010) ......................................................................28

*United States v. Staves,*
  383 F.3d 977 (9th Cir. 2004) ......................................................................22

*United States v. Walker River Irrigation Dist.,*
  890 F.3d 1161 (9th Cir. 2018) ....................................................................28

**STATUTES**

18 U.S.C. § 2511 ...........................................................................................3

47 U.S.C. § 605 ...........................................................................................28

47 U.S.C. § 605(e)(4) ..................................................................................28

Cal. Civ. Code § 1542 ..................................................................................17

Cal. Civ. Code § 1654 ...........................................................................21, 23

Cal. Civ. Code § 1798.140(v) ........................................................................4

Cal. Penal Code § 631 ..........................................................................Passim

Cal. Penal Code § 635 .................................................................24, 25, 27, 28

Cal. Penal Code § 637.2(b) ..........................................................................24

**RULES**

Fed. R. Evid. 201(b) ....................................................................................34

Fed. R. Evid. 201(b)(1)-(2) ..........................................................................34

## **INTRODUCTION**

Lululemon hired QM to secretly make recordings of everything anyone does on its website, lululemon.com, using a tool called "Session Replay."  According to QM's patent, this technology works by "monitor[ing] changes to the website and user interactions, such as mouse clicks, mouse movements, scrolling, and keyboard entry to relay action and changes through the initiation of additional browser requests to the web server."  FAC ¶¶ 32-34.  This monitoring occurs in real time, and can even monitor users across multiple devices.  *Id.* ¶¶ 23, 26.  Using this tool, Defendants are able to "pull up any user who had visited [a] website and watch their journey as if [the company] was standing over their shoulder."  *Id.* ¶ 18.  This technology also allows website owners to track anonymous visitors and send them email saying "We see you looking," and encouraging them to come back and buy products.  *Id.* ¶ 42.  This is a problem because, even though QM was not a party to Plaintiff's communications with the website, it now has a recording of Plaintiff's entire private shopping experience.  *Id.* ¶¶ 20-34.  Lululemon is not off the hook either, as it enabled QM's wrongdoing.  *Id.* ¶¶ 38-43.  QM's technology is not normal, not safe, and "far exceeds user expectations."  *Id.* ¶ 59; *see also id.* ¶¶ 36-37.  It also violates California's wiretap laws and right to privacy under the California Constitution.  Defendants' motion to dismiss should be denied in full.

## **ARGUMENT**

I.     **Plaintiff Sufficiently Alleges A Violation Of § 631(a)**

   A.     **QM Was Not A Party To The Communications**

      1.     **QM's Position Is Contrary To California Supreme Court and Ninth Circuit Authorities, And To The Text of § 631**

Defendants argue that QM is a party to the communication because it was "acting on Lululemon's behalf," and "stands in the shoes of Lululemon."  MTD at 8:3-11.  The notion that a company can hire third parties to secretly monitor communications between the company and its customers is contrary to the law for three separate reasons.

---

OPPOSITION TO MOTION TO DISMISS                                                          1
CASE NO. 5:20-CV-02439-JWH-SHK

First, the California Supreme Court has twice explained—including just this month—that the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line **permits an outsider to tap his telephone or listen in on the call**." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added). "As [the California Supreme Court] explained in *Ribas* … a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and **its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device**." *Smith v. LoanMe*, --- P.3d --- 2021 WL 1217873, at *8 (Cal. April 1, 2021) (emphasis added). The Ninth Circuit similarly explained in *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("*In re Facebook*"), that one of the purposes of wiretapping statutes is "to prevent the acquisition of the contents of a message by an unauthorized third-party or '**an unseen auditor**'"—like QM here. *See also id.* at 598 (explaining similar legislative goals of CIPA and the federal Wiretap Act).

The outcome in *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) ("*Moosejaw*") is instructive because it followed *Ribas* (as reaffirmed by *Smith*) and denied a motion to dismiss under similar facts. Like here, a retail website operator (Moosejaw) hired a third party software company (NaviStone) to "eavesdrop[] on [plaintiff's website] communications with Moosejaw." *Moosejaw*, 2019 WL 5485330, at *1. The *Moosejaw* court held NaviStone was not a party to the communication because "it cannot be that anyone who receives a direct signal escapes liability by becoming a party to the communication. Someone who presses up against a door to listen to a conversation is no less an eavesdropper just because the sound waves from the next room reach his ears directly. That person remains a third party, even as a direct recipient of the speaker's communication." *Id.*, at *2.

Second, unlike its federal counterpart, § 631(a) requires the consent of "all parties," and thus "both parties—the sender and the recipient of the

communication—must consent to the alleged interception."  *Matera v. Google Inc.*, 2016 WL 5339806, at *16 (N.D. Cal. Sept. 23, 2016) (explaining difference between CIPA § 631(a) and 18 U.S.C. § 2511); *see also People v. Windham*, 145 Cal. App. 4th 881, 889 (Cal. Ct. App. 2006) ("The Privacy Act differs from Title III in that it forbids wiretapping … unless all parties to a communication consent, while Title III permits a conversation to be intercepted or recorded where only one person has consented.").  Defendants' argument that QM was "acting on Lululemon's behalf" is just another way of saying that Lululemon consented to (or authorized) QM to monitor communications between Lululemon and its customers.  But that is not enough to comply with CIPA given that it is a two-party consent statute, and Plaintiff did not consent as explained below.

Third, QM cannot be a party to the communication because Plaintiff alleged she intended to communicate only with Lululemon.  *See* FAC ¶¶ 1, 4, 46, 54.  "[A] defendant does not actually participate in a conversation unless his presence is known to the other participants."  *United States v. Eady*, 648 F. App'x 188, 192 (3rd Cir. 2016); *see also S.D. v. Hytto Ltd.*, 2019 WL 8333519, at *7-8 (N.D. Cal. May 15, 2019) (rejecting similar argument Defendants make here because "[a]t no point does that FAC allege that users communicated with Hytto or with the Body Chat app itself."); *Lopez v. Apple, Inc.*, --- F. Supp. 3d ---, 2021 WL 823122, at *4 (N.D. Cal. Feb. 10, 2021) (rejecting argument that Apple was the intended recipient of communications because "Plaintiffs allege[d] that they did not intend Apple to receive their private communications, but that Apple 'captured' such communications using the software in their devices.").

### 2. Defendants' Arguments That QM Was A Party To The Communications Lack Legal Support

First, Defendants do not cite a single case holding that a company in Lululemon's position can hire a third party to secretly monitor that company's communications with customers.  Defendants cite *In re Facebook*, 956 F.3d at 607,

for the *general* proposition that a party to the communication is exempt from liability (subject to aiding and abetting liability addressed below).  Yet the *In re Facebook* court rejected the same argument Defendants make here, and as noted in Section I.A.1 above, *In re Facebook* supports Plaintiff's position.  *See In re Facebook*, 956 F.3d at 608 ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule. Therefore, we conclude that Facebook is not exempt from liability as a matter of law under the Wiretap Act or CIPA as a party to the communication").

Defendants cite *Rogers v. Ulrich*, 52 Cal. App. 3d 894, 899 (1975), and *Membrila v. Receivables Performance Mgmt., LLC*, 2010 WL 1407274 (S.D. Cal. Apr. 6, 2010), both of which are distinguishable because they involved a case of one person recording another, with no third-party involvement.  In both cases, the manufacturer of the recording devices were not defendants because, unlike QM here, they played no role in making the recording.  Likewise, the court in *Powell v. Union Pac. Railroad Co.*, 864 F. Supp. 2d 949, 955 (E.D. Cal. Mar. 31, 2012), determined there was no "third party" involved where two Union Pacific officers who were jointly conducting a company investigation participated in a phone call with another Union Pacific employee.  Hence, the *Moosejaw* court correctly rejected Defendants' interpretation of *Powell*.  *See Moosejaw*, 2019 WL 5485330 at *2 n.2.

Second, Defendants argue CIPA must be reconciled with the later-enacted California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.140(v), which defines "service providers" as entities that "process[] information on behalf of [the] business[.]"  MTD at 8:12-15.  As a preliminary matter, nothing in § 1798.140(v) immunizes service providers under the CCPA.  Even if it did, however, the CCPA does not narrow the application of CIPA because the CCPA was enacted to **further** privacy rights, and provides that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection

for the right of privacy for consumers shall control."  Civ. Code. § 1798.175.  CIPA broadly permits liability for "any person," without restriction on who they are or whether they are a service provider.  Cal. Penal Code § 631(a).  As shown in section I.B. below, the term "any person" cannot be construed narrowly.

Third, Defendants resort to hyperbole when they claim "Plaintiff's interpretation of § 631" would criminalize "myriad software services businesses routinely used to power and enhance the functionality of their websites."  MTD at 10:11-15.  That argument cannot support dismissal because it contradicts the allegations—which must be accepted as true—that QM's code is "not ubiquitous, routine Internet activity" and that it "far exceeds user expectations."  FAC ¶¶ 35-37, 59; *see also ENTTech Media Grp. LLC v. Okularity, Inc.*, 2021 WL 916307, at 3 (C.D. Cal. Mar. 10, 2021) (Holcomb, J.) (On a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken as true …").  The arguments also are based on unsupported factual assertions about how QM's technology works, and which cannot be resolved on a 12(b)(6) motion.  *See Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 841 (N.D. Cal. 2014) (defendant's factual assertions about how its technology works cannot support 12(b)(6) motion); *Moosejaw*, 2019 WL 5485330 at *3 (same).

Finally, on reply, Defendants will cite *Graham v. Noom, Inc.*, 2021 WL 1312765 (N.D. Cal. Apr. 8, 2021) and two other, related decisions issued by the same magistrate judge.  Notably, *Graham* appeared to agree with *Moosejaw*'s holding that a company can be liable for secretly permitting a third party to eavesdrop on communications between the company and its customers.  *See id*. at *6 (discussing *Moosejaw*).  However, the *Graham* court dismissed with leave to amend after concluding there were insufficient allegations that the session recording company at issue there (FullStory) "intercepted and used the data itself."  *Graham*, 2021 WL 1312765, at *5.  Thus, the court held further allegations were necessary to confirm that the session recording company had actually intercepted the communications, as opposed to simply providing a tool that allowed website

operators to analyze their own data.  *Id.*  As a preliminary matter, *Graham* erred because it does not matter whether QM used or sold the data: § 631(a) has four independent liability prongs, only one of which turns on whether someone sold or used data.  *See* Cal. Penal Code § 631(a).

In any event, *Graham* is distinguishable because here, QM argues at length that it "was a party to the communication." MTD at 7:1-10:25.  QM cannot simultaneously argue it was a "party to the communications" but never received those communications.  Any attempt to walk back these statements on reply would reinforce that there is a question of fact on this issue.  *See McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089, 1093-94 (9th Cir. 2020) (factual disputes raised by the defendant are "premature" on a 12(b)(6) motion).

The allegations also sufficiently support a plausible inference that QM intercepted communications between Lululemon and its customers.  The FAC alleges that QM is a service provider, not simply a software vendor, and that service is wiretapping.  FAC ¶ 9.  In their brief, Defendants repeatedly refer to QM's "services," and never argue it was simply a purveyor of software with no involvement in the wiretapping.  *See, e.g.*, MTD at 2:13, 6:23, 7:17, 9:2-4, 12:25.  The complaint also includes allegations that the communications are transmitted to QM's server, which would be unnecessary if QM was simply selling or licensing software for Lululemon to use on its own servers.  FAC ¶ 33.  The FAC goes on to reference a diagram from the patent, showing that communications are redirected to QM's "capture engine, **analysis engine**, and web session storage":

//

//

//

//



*Id.*  In short, like NaviStone in the *Moosejaw* case—and unlike the simple recording devices in *Rogers* and *Membrila*—Plaintiff has alleged that QM captures, stores, and analyzes Plaintiff's electronic communications, and thus has access to communications that were not intended for it.

**B.    Lululemon Is Liable For Enabling QM's Wiretapping**

Because QM is not a party to Plaintiff's communications, Lululemon may be liable under § 631 for enabling QM's conduct.  Statutory interpretation begins "with the language of the statute itself."  *Harris v. Harris*, 935 F.3d 670, 673 (9th Cir. 2019).  Section 631 not only prohibits wiretapping, but also imposes liability for "*any person*" who "aids, agrees with, employs, or conspires with" anyone who violates section 631(a).  Cal. Penal Code § 631(a) (emphasis added); *see also In re Lenovo Adware Litig.*, 2016 WL 6277245, at *8 (N.D. Cal. Oct. 27, 2016) (denying motion to dismiss CIPA claim based solely on allegation that the defendant "aided, agreed with, or conspired with" another defendant to violate section 631).  Section

631(a) includes no exemption for participants to a conversation who permit third parties to eavesdrop on that conversation.  *See* Cal. Penal Code § 631(a).  In other contexts, the Ninth Circuit and California Supreme Court have held that the term "'[a]ny person' means exactly that, and may not be interpreted restrictively." *Bonnichsen v. United States*, 367 F.3d 864, 874 (9th Cir. 2004); *see People v. Snyder*, 22 Cal. 4th 304, 314 (2000) ("[W]e entertain no doubt that the reference to 'any person' in section 84301 should be construed according to its plain and obvious meaning").  That same principle applies here because "the California Supreme Court's repeated finding that the California legislature intended for CIPA to establish broad privacy protections supports an expansive reading of the statute." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013).

The decision in *Moosejaw* is again instructive.  The *Moosejaw* court held that even if Moosejaw could not be liable for wiretapping its own communications, it could be liable under § 631 for "enabling NaviStone's wrongdoing." *Moosejaw*, 2019 WL 5485330, at *2 ("[I]t does not follow that parties to communications are immune from section 631 liability.").  The *Moosejaw* court followed the California Supreme Court's decision in *Ribas*, 38 Cal. 3d at 363, which as shown in Section I.A.1 above, held that § 631 was designed to cover situations like the one presented here where a person permits an outsider to secretly listen in on that person's calls.

Here, as in *Moosejaw*, Lululemon partnered with QM and "voluntarily embed[ed] QM's software code on [its] Website."  FAC ¶¶ 38-43.  Lululemon did so knowing that "QM's software captures the keystrokes, mouse clicks and other communications of visitors to its website." *Id.* ¶ 41.  Such behavior allowed QM to monitor, record, store, and analyze the electronic communications of Plaintiff and other users to Lululemon's website. *Id.* ¶¶ 18-34.  Accordingly, Lululemon has "aid[ed], agree[d] with, employ[ed], [and] conspire[d] with" QM, and is thus also liable for violating § 631.

### C. Plaintiffs' Website History And Interactions Are "Communications" Under *In re Facebook* and *In re Zynga*

Defendants argue the Court should dismiss the § 631(a) claim because "Quantum's platform did not access the 'contents' of her purported communication." MTD at 11:3-4. That is wrong. As a preliminary matter, the actionable "content" at issue here falls under two categories. The first category involves the webpages that Plaintiff asked to see while on the website. The second covers Plaintiff's keystrokes, mouse clicks and other information she provided while on the website.[1]

As for the first category of "content," last year, the Ninth Circuit reversed dismissal and held that the collection of website visitors' internet history and search terms supported claims under both CIPA and the federal Wiretap Act because they "divulge a user's personal interests, queries, and habits on third party websites." *In re Facebook*, 956 F.3d at 604-06. Even URL addresses may qualify as "content" because they reveal "'the particular document within a website that a person views.'" *Id.* at 605 (quoting *United States v. Forrester*, 512 F.3d 500, 510 n.6 (9th Cir. 2008)).

As for the second category of "content," Defendants admit in their brief that "the term 'contents' refers to the intended message conveyed by the communication." MTD at 11:7-8. Prior to *In re Facebook*, the Ninth Circuit explained the First Circuit had "correctly concluded" that "the content of the sign-up information customers provided to pharmaceutical websites, which included their 'names, addresses, telephone numbers, email addresses, dates of birth, genders, insurance statuses, education levels, occupations, medical conditions, medications, and reasons for visiting the particular website,'" were actionable communications under the federal Wiretap Act. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1107 (9th

---

[1] Although the FAC also describes collecting the date and time of Plaintiff's visit, her IP address, location, browser type and operating system, these are not the intended basis of the wiretapping claim. These facts add context and lend plausibility to the premise that Defendants are recording everything they can about website interactions, including the actionable content described above.

1    Cir. 2014) ("*In re Zynga*") (quoting *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir.
2    2003)).  "[S]earch term[s] or similar communication[s] made by the user" on the
3    internet also qualify as "content."  *Id*. at 1109.  After *In re Zynga*, district courts have
4    held a wide array of communications are covered by the Wiretap Act or CIPA,
5    ranging from Facebook "likes" to remotely activated changes to device settings.  *See*
6    *Rainsy v. Facebook, Inc.*, 311 F. Supp. 3d 1101, 1115 (N.D. Cal. 2018); *Hytto*, 2019
7    WL 8333519, at *7.

8        The outcome in *Moosejaw* is instructive because it involved very similar facts,
9    and both categories of "content" at issue here.  The court explained, "[Plaintiff]
10   requested information from Moosejaw by clicking on items of interest; Moosejaw
11   responded by supplying that information.  This series of requests and responses –
12   whether online or over the phone – is communication."  *Moosejaw*, 2019 WL
13   5485330, at *1.  The *Moosejaw* court likewise held that the Plaintiff's "interactions"
14   (*i.e.*, mouse clicks, keystrokes, and other website activities) were "communication[s]
15   within the meaning of section 631."  *Id.*  Here, the information captured by QM's
16   wiretapping is the same type of information covered by the above-cited authorities.
17   The FAC is based on public admissions by QM that it records not only which
18   webpages a user visits, but also everything a user does on those webpages,
19   everything they search for, and all the information they provide.  *See* FAC ¶¶ 18-37.

20       Defendants go too far when they claim that "all" of the information described
21   in the FAC is non-actionable "record information," as opposed to actionable
22   "content."  Defendants claim "mouse clicks and keystrokes" are "record
23   information," but never reconcile that position with their admission that "content"
24   means "the intended message conveyed by the communication."  Nor do they cite a
25   single case supporting their position.  Likewise, Defendants' position that URL's and
26   internet history are not "content" is directly contrary to *In re Facebook* and *In re*
27   *Zynga*.

28

Adopting Defendants' position requires ignoring the definition of non-actionable "record information." "Record information is typically data *generated automatically* at the sending of the message and is incidental to the use of the communication device." *Hytto*, 2019 WL 8333519, at *6 (emphasis added). "Unlike record information, content is generated not automatically, but through the intent of the user." *Id.* Thus, for example, if someone types in the body of an email that her name is "Jane Doe," then that information qualifies as "content"; whereas the automatic appearance of her name in the email "From" line might not. That is why *In re Pharmatrak* "correctly concluded" that name, address, and other information provided by website visitors in form fields are "content." *See In re Zynga*, 750 F.3d at 1107 (discussing distinction between information typed in an email messages as opposed to "automatically generated" information, and explaining that name, address, and other information provided by website visitors in form fields are "content"). The two categories of actionable content at issue here are not automatically generated, and it would be improper on a 12(b)(6) motion to infer that they are. *See Koala v. Khosla*, 931 F.3d 887, 894 (9th Cir. 2019) (addressing standard on 12(b)(6) motion).

Finally, Defendants also claim that certain information like Plaintiff's shipping and billing address would have been encrypted and thus not captured by QM. MTD at 12:17-19. Here again, Defendants are ignoring the standard under Rule 12(b)(6) by relying on unsupported factual assertions that contradict the pleadings. *See* FAC ¶¶ 23, 52-53 (describing problems with encryption and de-anonymization). And even if Defendants' claim were true, that does not address all the other forms of actionable content at issue described above.

## D.     Defendants' "In Transit" Arguments Are Contrary To The Law And Rest On Factual Disputes

Defendants argue that "Quantum's platform could not have 'read or attempted to read or to learn the contents or meaning' of any communication 'in transit'

because the 'communication' is accessed while on the user's device and is pseudonymized and encrypted before being transmitted from the user's device (or captured in deidentified form)." MTD at 15:1-5. These arguments fail for three reasons.

First, there is no requirement under § 631 that the communications be captured while "in transit." Defendants overlook that the liability prong it references is written in the disjunctive, imposing liability for eavesdropping on a communication "while [it] is in transit or passing over any wire, line, or cable, **or is being sent from, or received at any place within this state**." Cal. Penal Code § 631(a) (emphasis added). In *Moosejaw*, Judge Chhabria cited this disjunctive language when explaining that, unlike the federal wiretap law, "the particulars of the eavesdropping mechanism are of little consequence to the section 631 analysis," because "Section 631's protections extend explicitly to the beginnings and ends of communications." *Moosejaw*, 2019 WL 5485330, at *2. Allegations that the plaintiff interacted on a website by pressing mouse or keyboard buttons supported denial of a motion to dismiss. *See id.* The same allegations are present here. *See*, *e.g.*, FAC ¶¶ 2, 4, 22, 32, 46.

Second, the FAC sufficiently alleges that Plaintiff's electronic communications were intercepted "in transit." The Sixth Circuit rejected a similar argument Defendants advance here in *Luis v. Zang*, 833 F.3d 619, 624 (6th Cir. 2016), where the plaintiff alleged a program called "WebWatcher" "recorded all PC activity" including websites visited, webs searches, and "anything typed in real time." Marketing materials from the software manufacturer claiming the software did things like capture electronic communications "'in near real-time, even while the person is still using the computer,'" or acquired communications "'as [they were] being written and communicated between senders and recipients," supported a plausible inference that the communications were intercepted while in transit. *See id.* at 630-31. And in *Byrd v. Aaron's, Inc.*, 2012 WL 12887775, at *7 (W.D. Pa.

2012), another case involving keystroke capturing over the internet, the district court had "little trouble finding that the acquisition of Plaintiff's keystrokes constitutes an 'interception' under the statute." Finally, in *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1078, (N.D. Cal. 2015), the court distinguished the same authority Defendants cite here, *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002), because (1) plaintiffs alleged that the communications occurred "during the transmission process," and (2) there were "**no** allegations in the SCAC from which it can be established that the Carrier IQ Software operated on communications while they resided in … 'storage.'" (Emphasis in original).

Here, from the standpoint of simple common sense, it is hard to see how a contemporaneous recording could be made in anything other than "real time" and while the website communications are in transit. "QM's patent refers to 'monitoring' website 'interactions' 206 times," five of which reference "monitoring website interactions in 'real time.'" FAC ¶¶ 25-26. There are plenty of other allegations supporting real-time recording, most of which are based on QM's own words. *See* FAC ¶ 20 (QM's software collects data "in real time from one or more client devices … about interaction with and operation of a website … The information may be provided in real-time along with the document that is being monitored."); *id.* ("We give you real-time visibility into all behavioral, technical, and segment data."); *id.* at ¶ 26 ("The present disclosure relates generally to capturing dynamic real-time changes to a web document within a browser").[2] The figure shown in Paragraph 33 of the FAC also shows QM's interception of communications in real time, where QM's "server-side capture engine" intercepts user data "along the way" to the web server.

---

[2] Defendants attempt to distinguish "the after-collection *aggregation* of data … in real time" as opposed to the "collection or capture of any data." MTD at 13:22-24. This argument makes no sense. Aggregation could not occur in real time if the data was not also collected in real time. Further, QM's patent states that both occur in real time.

Third, it is clear that Defendants are **yet again** asking the Court to resolve technical factual issues when they argue that communications are accessed while still on the users' devices. Even the figure Defendants cite on page 14 of their brief demonstrates that is the case. The diagram shows that when a user loads a website, QM's software is loaded immediately and "begins monitoring for DOM changes, user interactions." QM's software then "captures user interaction."



In presenting the above-chart, however, Defendants are asking the Court to adopt their own self-serving statements about how QM's technology works without the benefit of evidence or expert discovery. Doing so on a 12(b)(6) motion would be reversible error. *See McAdory*, 952 F.3d at 1093-94.

Equally important, even if Plaintiff's communications were temporarily stored before being transmitted to QM, this would still be interception "in transit." In *In re Carrier IQ*, the court addressed whether "an electronic communication can be 'intercepted' when it is acquired in **transitory** electronic storage that is **part of the overall transmission process** of an electronic message." *In re Carrier IQ*, 78 F. Supp. 3d at 1081 (emphasis in original). Judge Chen concluded that "even if the

Defendants are factually correct that the communications at issue in this case were in transitory storage on Plaintiffs' mobile devices (such as the devices' random access memory, cache memory, etc.) when the Carrier IQ Software operated on them, it is not at all apparent why there was no 'captur[ing] or redirect[ing]' of these communications contemporaneous with their transmission." *In re Carrier IQ*, 78 F. Supp. 3d at 1082.  According to Defendants, this is exactly what happened here: "the 'communication' is accessed while on the user's device … before being transmitted from the user's device." MTD at 15:2-5.  Thus, even if Defendants are correct as to when communications are captured—and they are not—such capturing would still occur "in transit" because the communications were "acquired in transitory electronic storage that is part of the overall transmission process of an electronic message." *In re Carrier IQ*, 78 F. Supp. 3d at 1081.

Finally, Defendants' cases are inapposite.  In *Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004), the email messages reached their intended destination—an ISP server—before being accessed.  *Theofel*, 359 F.3d at 1075 ("There is no dispute that messages remaining on NetGate's server after delivery are stored ").  Similarly, in *Bunnell v. Motion Picture Ass'n of Am.*, 567 F. Supp. 2d 1148 (C.D. Cal. 2007), "[p]laintiffs' server stored the emails before they were copied and forwarded to Anderson's email account."  *Burnell*, 567 F. Supp. 2d at 1154; *see also In re Carrier IQ*, 78 F. Supp. 3d at 1081 ("*Konop*, *Theofel*, and every case cited by Defendants in this action involve situations where the transmission of the communication at issue had terminated and it had reached its *final destination*, even if only for a moment.") (emphasis in original).  Here, by contrast, the communications were never stored on Plaintiff's device because she did not communicate with anyone until she accessed Lululemon's website.  And it was only while Plaintiff was accessing the website that QM intercepted here electronic communications.  FAC ¶¶ 20, 26, 33.

### E.   Lululemon's Privacy Policy Does Not Support Dismissal

Defendants claim that Plaintiff's § 631(a) claim must fail because "Lululemon's Privacy Policy explicitly disclosed that Lululemon collects such data and uses service providers (like Quantum) to aid in this collection and analyze these interactions." MTD at 15:19-21.  This is wrong for at least three reasons.

#### 1.   Plaintiff Was Wiretapped Before The Hyperlink To The Privacy Policy Appeared On Plaintiff's Screen

As an initial matter, Plaintiff was not even shown a hyperlink to Lululemon's Privacy Policy until **after** Plaintiff was already wiretapped.  As Plaintiff alleges, Defendants' wiretapping "begins **the moment** a user accesses or interacts with the Website." FAC ¶ 47 (emphasis added).  Thus, the second a user accesses lululemon.com, QM begins recording the user, before a user could possibly read the Privacy Policy and (allegedly) be told that they are being recorded.  These allegations must be accepted as true and construed in the light most favorable to Plaintiff.  *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The vast majority of courts—including in data privacy cases—have found such "retroactive" or "post-hoc" consent to be invalid.  *See Keck v. Bank of Am.*, 2008 WL 1743445, at *1 (N.D. Cal. Apr. 15, 2008) (denying motion to dismiss CIPA claim where defendant unsuccessfully argued plaintiff provided "after-the-fact consent" to be recorded); *Mastronardo v. Mastronardo*, 2018 WL 495246, at *5 (Pa. Super. Ct. Jan. 22, 2018) ("[Appellant] claims that consent obtained after-the-fact is, nonetheless, consent.  It is not."); *Kauders v. Uber Techs., Inc.*, 2019 WL 510568, at *5 (Mass. Super. Ct. Jan. 3, 2019) (plaintiff did not consent to arbitration where the terms were not disclosed until after the plaintiff created an account); *Fleury v. Union Pac. R.R. Co.*, 2021 WL 1124309, at *8 (N.D. Ill. Mar. 24, 2021) ("BIPA requires an entity to provide the requisite notice and obtain consent [b]efore obtaining any fingerprint.") (internal quotations removed); *cf. United States v. Johnson*, 875 F.3d

1265, 1277, n.7 (9th Cir. 2017) ("[W]ritten consent, provided after the search had already occurred, did not retroactively establish valid consent.") (emphasis removed); *United States v. Arreguin*, 453 F. App'x 678, 681 (9th Cir. 2011) ("Arreguin's consent cannot be used to support the validity of the warrantless search because Arreguin signed the consent form only after the search was conducted.").

Further, by the time anyone would see the privacy policy, they would already have a viable claim for wiretapping. Under California law, a user cannot agree to waive claims he or she did not know they had. *See* Cal. Civ. Code § 1542 ("A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."). To the extent the privacy policy purports to include a waiver of claims, it is unconscionable. *See Casey v. Proctor*, 59 Cal. 2d 97, 111-12 (1963) (holding release invalid where release "is a prepared form drafted by experts and presented in a take it or leave it manner, while the releaser is ordinarily an individual without any knowledge of legal documents or assistance from legal counsel"). There also is a question of fact as to whether Lululemon even intended the privacy policy to release existing claims for itself and for QM. *See Leaf v. City of San Mateo*, 104 Cal. App. 3d 398, 411 (1980) ("Whether the releaser intended to discharge such claims or parties is ultimately a question of fact").

Defendants cite one case to the contrary: *Javier v. Assurance IQ, LLC*, 2021 WL 940319 (N.D. Cal. Mar. 9, 2021). But the *Javier* court's ruling defies the plain meaning of the word "consent," which "[c]olloquially … implies permission given **in advance**." *Cothron v. White Castle System, Inc.*, 467 F. Supp. 3d 604 (N.D. Ill. 2020) (emphasis added) (finding no consent where White Castle asked plaintiff for consent to share biometric information after such information had already been shared); Article 29 Data Protection Working Party, *Opinion 15/2011 On The Definition Of Consent*, at 31 (July 13, 2011) ("It makes good sense for consent to be

obtained prior to the starting of the data processing … [I]n such cases, if the individual decided against consenting, any data processing that had already taken place would be unlawful for that reason as well.").  Further, as noted above, apart from *Javier*, there are no cases holding retroactive consent is valid in the privacy context.[3]

### 2.   The Privacy Policy Arguments Fail Under *Nguyen*

Even if retroactive consent was valid—and it is not—Plaintiff was not on notice of the hyperlink to the Privacy Policy, let alone given the option to *agree* to the Privacy Policy.  "The critical question with respect to implied consent is whether the parties whose communications were intercepted had adequate notice of the interception."  *In re Google Inc.*, 2013 WL 5423918, at *12.  A website may only bind a user to terms "where the existence of the terms was reasonably communicated to the user."  *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 764 (N.D. Cal. 2019).

The Ninth Circuit's decision in *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) controls here.  There, the Ninth Circuit held, "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website

---

[3] The *Javier* court relied on two decisions:  *Salgado v. Carrows Rest., Inc.*, 33 Cal. App. 5th 356 (2019) and *Franco v. Greystone Ridge Condominium*, 39 Cal. App. 5th 221 (2019).  Neither supports the *Javier* court's holding.  In *Salgado*, a defendant was added to a lawsuit **after** the plaintiff signed an arbitration agreement.  *Salgado*, 33 Cal. App. 5th at 359.  And in *Franco*, not only was the plaintiff provided the arbitration agreement before filing his claim, the arbitration agreement specifically referenced "pre-hire" matters, and thus had language explicitly stating it applied retroactively.  *Franco*, 39 Cal. App. 5th at 223.  The *Javier* court also reasoned that the privacy policy in that case was "phrased in present tense—'we collect' data … not 'we will collect,'" and therefore "gives fair notice that Javier consents to actions that may have already taken place."  *Javier*, 2021 WL 940319, at *3.  But courts do not construe the present tense in contracts to apply to or cover past actions.  *See Russell v. Citigroup, Inc.*, 748 F.3d 677, 679 (6th Cir. 2014) ("The use of the present-tense 'arise,' rather than the past-tense 'arose' or present-perfect 'have arisen,' suggests that the contract governs only disputes that begin—that arise—in the present or future. **The present tense usually does not refer to the past**.") (emphasis added).

but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id.* at 1178-79 (internal citations omitted).  The rule in *Nguyen* applies where a defendant argues disclosures in its Privacy Policy furnish a consent defense.  *See Moreno v. San Francisco Bay Area Rapid Trans. Dist.*, 2017 WL 6387764, at *3 (N.D. Cal. Dec. 14, 2017) (following *Nguyen* and rejecting consent argument based on defendant's privacy policy); *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1072-73 (N.D. Cal. 2016) ("*Opperman II*") (same).

Plaintiff's allegations fall squarely within *Nguyen*.  Plaintiff alleges the hyperlink to Lululemon's Privacy Policy on Lululemon's checkout page "remains buried at the very bottom of the webpage in tiny, 7.5 non-contrasting font that was designed to be unobtrusive and easy to overlook, and is located on a cluttered checkout page."  FAC ¶ 56; *see also Colgate*, 402 F. Supp. 3d at 766 (hyperlinks insufficient where "they are the same size as the sentence they are in."); *Maree v. Deutsche Lufthansa AG*, 2021 WL 267853, at *4 (C.D. Cal. Jan. 26, 2021) (hyperlinks insufficient where "Expedia.com's Terms of Use are not highlighted, underlined, in all capital letters, or displayed inside of a conspicuous and clickable box"); *Cullinane v. Uber Tech., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) ("The inclusion of the additional payment option and the placement of a large blue PayPal button in the middle of the screen were more attention-grabbing and displaced the hyperlink to the bottom of the screen.").

Defendants believe they are saved by *Javier*'s analysis of notice.  They are not.  While the parties in that case disputed whether the hyperlink to the privacy policy was conspicuous, it was undisputed that the website contained language stating that "by clicking 'View my Quote,' the user provides an 'electronic signature as an indication of ... intent to agree to the website's Privacy Policy' and 'Terms of Service.'"  *Javier*, 2021 WL 940319, at *1.  By contrast, Lululemon's checkout page

states "a user may 'learn more' by viewing the Privacy Policy, not that they are agreeing to the Privacy Policy in any manner."  FAC ¶ 56.  This unadorned hyperlink (*i.e.*, users are not told they consent to the Privacy Policy by placing their order) is insufficient to provide notice.  *See, e.g.*, *Nguyen*, 763 F.3d at 1179 ("[E]ven close proximity of the hyperlink to relevant buttons users must click on—without more— is insufficient to give rise to constructive notice."); *Berman v. Freedom Financial Network, LLC*, 2020 WL 5210912, at *3 (N.D. Cal. Sept. 1, 2020) ("[T]here is no text that notifies users that they will be deemed to have agreed to these terms nor prompts them to take any affirmative action to demonstrate assent.") (internal quotations omitted); *Motley v. ContextLogic, Inc.*, 2018 WL 5906079, at *2 (N.D. Cal. Nov. 9, 2018) ("The screens also did not provide any notice that merely using the website would be deemed acceptance of the terms of service.  The only thing ContextLogic's screens featured was an unadorned hyperlink to the terms of service.").  In short, Plaintiff has alleged she had no notice of the Privacy Policy (FAC ¶¶ 54-56, 62), and Defendants cannot prove notice here.

### 3.    At Best, Whether The Privacy Policy Discloses The Wiretapping Is A Question Of Fact

"[C]onsent is only effective if the person alleging harm consented to the particular conduct, or to substantially the same conduct, and if the alleged tortfeasor did not exceed the scope of that consent."  *Opperman II*, 205 F. Supp. 3d at 1072-73 (internal quotations omitted).  If there is a dispute over the scope of a privacy policy or whether it adequately discloses the conduct at issue, then that is a question of fact that cannot be resolved on the pleadings.  *See id.* (holding that "a reasonable jury could find that Yelp's Privacy Policy provisions do not explicitly address—and thus do not obtain knowing consent for—the uploading of a user's address book data for the purpose of finding friends who are already registered Yelp users"); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 823 (N.D. Cal. 2020) ("[W]here, as here, the contract language at issue is reasonably susceptible to more than one

interpretation, with one of those interpretations suggesting consent and another belying it, the Court cannot decide the consent issue in [Defendants'] favor.") (internal quotation omitted).

Furthermore, any ambiguities in terms must be construed against the drafter (*i.e.*, Lululemon). *See* Cal. Civil Code § 1654; *Dufour v. Allen*, 748 F. App'x 150, 151 (9th Cir. 2019) ("California recognizes the doctrine of *contra proferentem*, that is, construing ambiguous agreements against the drafter") (citing Cal. Civ. Code § 1654). This rule applies to privacy policies. *See In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1076 (N.D. Cal. June 12, 2012) (applying § 1654 to privacy policy). Here, there are several reasons why a jury could find Lululemon's Privacy Policy does not disclose QM's wiretapping.

<u>First</u>, Lululemon's Privacy Policy ironically discloses that it employs "'[v]ideo monitoring and recording' in its retail stores. But Lululemon does not disclose the same for recording website activities." FAC ¶ 60. Thus, a jury could reasonably conclude that when Lululemon wants to disclose recording, it does so explicitly.

<u>Second</u>, Defendants rely on a passage stating that Lululemon "share[s] personal data with unaffiliated companies or individuals we hire or work with that perform services on our behalf." MTD at 17:2-5. But the Privacy Policy does not mention QM by name nor define specifically what "personal data" is sent to whom. Further, the "personal data" section of Lululemon's Privacy Policy does not include mouse clicks, keystrokes, scrolls, name, and shipping and billing addresses. RJN Ex. D, at 68. This disclaimer is thus far too vague to disclose the use of QM or what data QM collects. *Opperman II*, 205 F. Supp. 3d at 1074 ("[I]t is unclear whether the language in the relevant Privacy Policy provisions even applies to the Friend Finder function at issue in this lawsuit."); *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *6 (N.D. Cal. Feb. 2, 2021) ("These statements may not be understood by a reasonable user to disclose collection of her usage information on an independent third-party app."); *Brown v. Google LLC*, --- F. Supp. 3d ---, 2021 WL 949372, at *8 (N.D. Cal.

Mar. 12, 2021) ("[A] Google user reading the general disclosure [], which never mentions private browsing mode, might have reasonably concluded that Google does not collect this data from users in private browsing mode.").

Second, Defendants rely on a portion of the Privacy Policy stating that "others … *may* use cookies, web beacons, device identifiers, and other tracking technologies which collect information about your use of the Services and other websites and applications." MTD at 17:12-15 (emphasis added). But as a matter of law, "[t]hat the person communicating knows that the interceptor has the **capacity** to monitor the communication is insufficient to establish implied consent." *In re Google Inc.*, 2013 WL 5423918, at *12 (emphasis in original). Nor may Defendants argue this language made the recording foreseeable, because the "foreseeability of monitoring is insufficient to infer consent" to wiretapping. *United States v. Staves*, 383 F.3d 977, 981 (9th Cir. 2004).

Further, given that this technology is not normal, not obvious, and **far exceeds user expectations** (FAC ¶¶ 35, 59), the use of "cookies" is not sufficient, and a reasonable user would not believe "tracking technologies" encompasses QM's technology. Finally, this section of the Privacy Policy largely deals with advertising and marketing, which is not QM's purpose. *Campbell*, 77 F. Supp. 3d at 848 ("[A]ny consent with respect to the processing and sending of messages itself does not necessarily constitute consent to the specific practice alleged in this case—that is, the scanning of message content for use in targeted advertising."); *In re Google Inc.*, 2013 WL 5423918, at *13 (acceptance of activity "under a different set of circumstances for a different purpose" "does not establish explicit consent").

Defendants again cite *Javier* to decry Plaintiff's attempt to "parse the language of the Policy." MTD at 20:13. But this is not mere nitpicking. It is not difficult for Lululemon to explicitly disclose the use of QM in its Privacy Policy, rather than resorting to vague generalities and ambiguities (which in any event must be construed against Defendants pursuant to Cal. Civil Code § 1654). This minimal

burden is all the more important when companies seek to use highly invasive, abnormal technologies such as QM that "far exceed user expectations."  FAC ¶ 59.  Yet Lululemon has failed at this simple task, and the boilerplate, vague, and ambiguous terms in its Privacy Policy do not adequately disclose its use of QM.

## II.   Plaintiff States A Claim For Violations Of CIPA § 635 And Federal Wiretap Act § 2512

### A.   Both Statutes Permit A Private Right Of Action

Defendants first argue that Plaintiff lacks a private right of action under Section 2512 of the federal Wiretap Act.  MTD at 22:13-20.  That argument was rejected by *Luis v. Zang*, 833 F.3d 619 (6th Cir. 2016), where the Sixth Circuit distinguished the same authority Defendants rely upon and held that "the facts of the current case are materially different from the facts of cases such as *Treworgy*" because in those cases, "the courts were focused on whether a defendant's possession of a wiretapping device, without more, was sufficient to support a private cause of action."  *Id.* at 637.  The Sixth Circuit explained its reasoning as follows:

> The present case, in contrast, involves much more than simple possession. Instead, as described above, Awareness allegedly manufactured, marketed, and sold WebWatcher with knowledge that it would be primarily used to illegally intercept electronic communications. **It then remained actively involved in the operation of WebWatcher by maintaining the servers on which the intercepted communications were later stored for WebWatcher's users**. Awareness thus allegedly took a much more active role in causing the Wiretap Act violation in this case than the defendants in other cases who did nothing more than possess a wiretapping device in contravention of § 2512(1)(b).
> …
> [W]e today hold that a defendant such as Awareness— which allegedly violates § 2512(1)(b) by manufacturing, marketing, and selling a violative device—is subject to a private suit under § 2520 only when that defendant also plays an active role in the use of the relevant device to

> intercept, disclose, or intentionally use a plaintiff's
> electronic communications.

*Id.* at 637 (emphasis added).

Here too, Plaintiff alleges that Defendants did far more than merely possess the wiretapping software.  Plaintiff alleges Defendants were actively involved in the wiretapping process.  *See* FAC ¶¶ 38-43.  And Defendants do not dispute these allegations, nor could they in good faith.  Thus, consistent with *Luis*, Plaintiff has a private right of action under Section 2512 of the Wiretap Act.

Next, Defendants argue that there is no private right of action under CIPA § 635 because "a private person cannot possibly be 'injured by a violation' of § 635."  MTD at 23:14-15.  Defendants' argument contradicts the text of CIPA.  Section 635 imposes liability on "**[e]very person** who … **possesses** … or furnishes to another **any device** which is primarily or exclusively designed or intended for eavesdropping."  Cal. Penal Code § 635 (emphasis added).  Section 637.2 provides that "it is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or been threatened with actual damages."  *Ion Equip. Corp. v. Nelson*, 110 Cal. App. 3d 868, 882 (1980); *see also* Cal. Penal Code § 637.2(b) (permitting any person to "bring an action to enjoin and restrain any violation of this chapter, **and may in the same action seek damages as provided by subdivision (a)**") (emphasis added).  Thus, as was held in *Moosejaw*, there is a private right of action under § 635.  *Moosejaw*, 2019 WL 5485330, at *3 (denying motion to dismiss § 635 claim).[4]  Defendants cite no contrary authority involving claims under CIPA.

## B.    Plaintiff Has Article III Standing

Relying on *Spokeo, Inc. v. Robbins*, 136 S. Ct. 5140 (2016), Defendants argue that "the requisite 'injury in fact' required for standing under Article III is absent."  MTD at 24:16-18.  That is wrong.

---

[4] Notably, the court's holding in *Moosejaw* is consistent with the Sixth Circuit's holding in *Luis*.

The court in *Moosejaw* rejected Defendants' same argument, based on the same authority, when it held that the plaintiff in that case had standing to assert a claim under § 635. *Moosejaw*, 2019 WL 5485330, at *1. The court first explained that wiretapping is "not at all like the sort of 'bare procedural violation' that the Supreme Court has said [in *Spokeo*] would fall short of an Article III injury," and then explained that plaintiff "alleged injuries traceable to Moosejaw's possession and use of the [internet monitoring] device." *Id.*, at *1, *3. Moreover, the Ninth Circuit has held that wiretapping claims—including under CIPA—are sufficient to confer Article III standing under *Spokeo*. *See In re Facebook*, 956 F.3d at 599 (holding "Plaintiffs have adequately alleged an invasion of a legally protected interest that is concrete and particularized" based on an alleged violation of CIPA); *see Romero v. Securus Techs., Inc.*, 216 F. Supp. 3d 1078, 1088 (S.D. Cal. 2016) (rejecting Defendants' same argument, holding "[a] violation of CIPA involves much greater concrete and particularized harm than a technical violation of the Fair Credit Reporting Act [], the statute at issue in *Spokeo*.").

Standing is also supported by the Sixth Circuit's decision in *Luis*. The *Luis* court first noted a split of authority as to whether mere possession alone could support a claim under § 2512(b), but ultimately concluded that possession, coupled with "knowledge" and "active[] involve[ment]" with the wiretapping, could support a claim. *Luis*, 833 F.3d at 636-37. That is the case here. FAC ¶¶ 38-43.

## C. Plaintiff Sufficiently Alleges That Quantum's Software Is Primarily Or Exclusively Designed For Eavesdropping

Defendants first argue Plaintiff's allegation that the wiretapping software is a "device" under the Wiretap Act and CIPA is "conclusory," and ask the Court to invoke the doctrine of lenity in interpreting "device" under both statutes. MTD at 25:7-14. Defendants further argue it cannot be plausibly inferred that the wiretapping software is "primarily or exclusively used for eavesdropping" because it

"helps businesses improve their website design and customer experience." *Id.* at 25:16-19.  These arguments are meritless for several reasons.

First, Plaintiff alleges that "QM's code is a 'device' that is 'primarily or exclusively designed' for eavesdropping.  That is … QM's code is designed to gather PII, including keystrokes, mouse clicks, and other electronic communications."  FAC ¶ 89.  That is sufficient.  *See Moosejaw*, 2019 WL 5485330, at *3 ("At the pleading stage, the Court must assume the truth of Revitch's allegation that NaviStone's code is a device … primarily or exclusively designed or intended for eavesdropping upon the communication of another.") (internal quotations omitted).  And just like the federal Wiretap Act, CIPA applies to "new technologies" such as internet monitoring software.  *See Matera*, 2016 WL 8200619, at *21; *Moosejaw*, 2019 WL 5485330, at *3 (internet monitoring software); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d at 1087 (monitoring software a device under federal wiretap law); *Luis*, 833 F.3d at 634 (same); *cf. In re Facebook*, 956 F.3d at 596 (software plug-ins that tracked internet usage actionable under CIPA).

Second, Defendants' lenity argument was rejected by the California Supreme Court in *Smith*, 2021 WL 1217873, at *10, a case concerning alleged CIPA violations, where it reinforced the notion that "[t]he rule of lenity does not apply every time there are two or more reasonable interpretations of a penal statute."  *Id.* To the contrary, "[t]he legislative history, the purpose of the [CIPA], general public policy concerns, and logic," as well as "the statutory language" itself, favored a broad interpretation of the statute.  *Id.*  Accordingly, *Smith* declined to apply the rule of lenity" to CIPA.  *Id.*  The argument also must be rejected under Ninth Circuit law.  "A statute is not ambiguous simply because it is *possible* to construe a statute narrowly."  *United States v. LeCoe*, 936 F.2d 398, 402 (9th Cir. 1991) (emphasis in original).  Instead, there must be "grievous ambiguity."  *Gollehon v. Mahoney*, 626 F.3d 1019, 1027 (9th Cir. 2010).  That is not the case here, given that caselaw and

legislative history "support an expansive reading of the statute." *In re Google Inc.*, 2013 WL 5423918 at *21; *accord Matera*, 2016 WL 8200619, at *21.

Third, Defendants' argument that its wiretapping software helps companies improve its websites conflates what the software does with Defendants' purported motive for using that software. If Defendants' argument could support dismissal, then any defendant could avoid liability by simply claiming they had an ulterior motive for the wiretapping. Motive, however, is irrelevant because it is not an element of a claim under § 635. The argument also contradicts the pleadings. *See* FAC ¶ 42

Fourth, at minimum, courts have rejected the same or similar arguments raised by Defendants because they rest on factual disputes about how the defendant's technology operates. *See Moosejaw*, 2019 WL 5485330 at *3 (the question of whether defendant's internet tracking technology was a wiretap "device" under § 635 of CIPA is a question of fact); *cf. In re Carrier IQ, Inc.*, 78 F. Supp. 3d at 1082 ("[E]ven if the Defendants are factually correct that the communications at issue in this case were in transitory storage on Plaintiffs' mobile devices … it is not at all apparent why there was no 'captur[ing] or redirect[ing]' of these communications contemporaneous with their transmission.").

**D.    Lululemon's Conduct Violates CIPA And The Federal Wiretap Act**

Section 635 imposes liability for "possessing" a wiretapping device. Lululemon does not dispute that it possessed QM's software. Lululemon nonetheless argues that the term "possess" should be "limited to the actual manufacturing chain and distribution and sales channels." MTD at 26:16-18. Lululemon cites no authority for this theory because there is none. If the legislature wanted to impose liability only on entities who manufactured and distributed such devices, then the word "possess" would simply not be included in the statute. For example, the Federal Communications Act ("FCA"), 47 U.S.C. § 605, prohibits piracy of cable and satellite television and contains a provision similar to § 635. In contrast to CIPA,

however, § 605(e)(4) of the FCA does not include the word "possess," and is expressly limited to people who manufacture[], assemble[], modif[y], import[], export[], sell[], or distribute[]" regulated devices.  *See* 47 U.S.C. § 605(e)(4).

Lululemon's argument is premised solely on the canon of *noscitur a sociis*, the principle that "a word is known by the company it keeps."  *United States v. Walker River Irrigation Dist.*, 890 F.3d 1161, 1170 (9th Cir. 2018).  But that canon only applies when a word is ambiguous.  *See United States v. Monday*, 614 F.3d 983, 985-86 (9th Cir. 2010) ("[T]he doctrine of *noscitur a sociis* ... might be availing, or at least relevant, if the language of the statute were ambiguous.  But it is not.").  Lululemon does not argue that the word "possess" is ambiguous, nor can it.  Thus, the plain meaning of the statute governs, and Lululemon is liable based on its possession, implementation, and use of QM's software code.  *See Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.*, 133 Cal. App. 4th 26, 29, 34 (2005) ("If there is no ambiguity in the language [of a statute], we presume the Legislature meant what it said, and the plain meaning of the statute governs.");  *accord Ades v. Omni Hotels Mgmt. Corp.*, 46 F. Supp. 3d 999, 1007 (C.D. Cal. 2014) (rejecting narrow interpretation of CIPA); *Maghen v. Quicken Loans, Inc.*, 2014 WL 12586447, at *4 (C.D. Cal. Oct. 28, 2014) (same).

**III.  Plaintiff States A Claim For Invasion Of Privacy**

    **A.    Dismissal Of The Invasion Of Privacy Claim Would Be Reversible Error Under *In re Facebook***

Defendants make an important admission in their brief when they state that a "legally recognized privacy interest" includes the interest in "**conducting personal activities without observation**, intrusion or interference ('autonomy privacy.')."  MTD at 27:16-17 (emphasis added, internal quotations omitted).  Thus, "courts have repeatedly found the surreptitious recording of a plaintiff's conversations or activity to constitute an actionable intrusion."  *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 829.  Likewise, whether the secret monitoring of internet activity is

egregious enough to support an invasion of privacy claim is generally a question of fact not suitable for resolution on the pleadings.

*In re Facebook* controls.  There, the Ninth Circuit reversed dismissal in a case alleging Facebook surreptitiously collected internet user's web browsing history.  *In re Facebook*, 956 F.3d at 602.  The court explained, "[t]he ultimate question of whether Facebook's tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage."  That rule necessarily applies here too because, as discussed in Argument § I.C., *supra*, QM gathers much more than internet browsing history from visitors to lululemon.com.

*In re Facebook* did not set forth a new rule, nor is it unique.  Defendants mistakenly rely on *Opperman II*, 205 F. Supp. 3d at 1079, but that case supports Plaintiff's position, not Defendants'.  There, the district court **twice** held (first on a motion to dismiss and then later on summary judgment) that the question of whether surreptitious data collection supported a common law privacy claim presented a question of fact for the jury.  *See id.*; *see also Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1061 (N.D. Cal. 2014) ("*Opperman I*") (explaining that whether the conduct at issue was offensive enough to support a claim was a factual dispute "best left for the jury."); *In re Vizio, Inc. Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1233 (C.D. Cal. 2017) (collection of personally identifiable information may amount to a highly offensive intrusion).

Finally, as noted above, *Moosejaw* involved very similar facts as those presented here.  Just like Defendants argue here, the defendants in *Moosejaw* argued that the common law privacy claims failed because the plaintiff's mouse clicks and keystrokes on a clothing retailer's website "were not particularly sensitive."  *Compare Moosejaw*, 2019 WL 5485330, at *3, *with* MTD at 28:9-13.  The *Moosejaw* court rejected that argument, explaining, "[a] jury could conclude that this intrusion, which allegedly allowed NaviStone [the analog to QM here] to associate

1    [plaintiff's] browsing habits with his identity, is a highly offensive breach of norms."

2    *Id.*  So too here, Plaintiff alleges that QM sees everything anyone does on

3    lululemon.com, "as if [QM] was standing over their shoulder."  FAC ¶ 18.  Even

4    anonymous website visitors can receive emails stating that Lululemon "see[s] you

5    looking," and encouraging the website visitor to come back to the website to buy

6    Lululemon's products.  FAC ¶ 42.

7        **B.    Defendants' Arguments And Authorities Do Not Support Dismissal**

8        Defendants' arguments and authorities do not support dismissal for five

9    reasons.  <u>First</u>, Defendants argue they can secretly record everything done a website,

10   and then send marketing emails to anonymous website users saying "we see you

11   looking" (FAC ¶¶ 18, 42), because Plaintiff has no legally recognized privacy

12   interest.  MTD at 27:3-29:16.  Yet Defendants overlook their own admission that

13   people have a legally protected interest in "conducting personal activities without

14   observation."  MTD at 27:17 (quoting *Hill v. Nat'l Collegiate Athletic Ass'n.*, 7 Cal.

15   4th 1, 35 (1994)).  Moreover, in *In re Facebook*, 956 F.3d at 601, the Ninth Circuit

16   abandoned the three-part test cited by Defendants in favor of a simplified inquiry:

17   "whether (1) there exists a reasonable expectation of privacy, and (2) the intrusion

18   was highly offensive."  Under this formulation, whether information is confidential

19   or involved "bodily autonomy"—as Defendants argue is necessary—does not

20   control.  *See id.* at 602-603.  Instead, the Ninth Circuit first considered whether the

21   defendant "gained unwanted access to data by electronic or other covert means, in

22   violation of the law or social norms," and then held that a jury would have to decide

23   whether the access was offensive.  *Id.* at 601-602.  The same analysis governs here.

24        Second, Defendants make a series of brief arguments that Plaintiff had no

25   reasonable expectation of privacy, but none have merit.  Defendants argue

26   Lululemon's privacy policy forecloses any reasonable expectation of privacy, but

27   that argument ignores the allegation that visitors are recorded **before** they have any

28

opportunity to read the privacy policy (FAC ¶ 58), and never have notice of its existence or agree to it (*Id.* ¶¶ 55-57) in any event. *See also* Argument §§ I.E.1-I.E.2, *supra*. Defendants' alternative argument that Plaintiff voluntarily shared her information with Lululemon glosses over the allegations that Plaintiff did not voluntarily share her information with QM. *Id.* at ¶¶ 4, 62.

Defendants further argue that QM's session recording technology is "part of routine internet functionality." MTD at 31:21. That argument contradicts the allegations—which must be accepted as true—that QM's code is "not ubiquitous, routine Internet activity" and that it "far exceeds user expectations." FAC ¶¶ 35-37, 59; *see also ENTTech Media*, 2021 WL 916307, at *3 (On a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken as true ...."). Defendants also are making factual arguments about QM's technology that cannot be resolved on the pleadings. *See Campbell*, 77 F. Supp. 3d at 841 (defendant's factual assertions about how its technology works cannot support 12(b)(6) motion); *Moosejaw*, 2019 WL 5485330 at *3 (same).

Finally, Defendants argue Plaintiff had no reasonable expectation of privacy because she "does not allege that Defendants tracked or collected any information after she left Lululemon's website." MTD at 32:9. Defendants offer no explanation why that would be required to state a claim. Someone who peers into another's window or puts an ear to a wall is a Peeping Tom or eavesdropper, regardless of whether they follow the victim around wherever he or she may go. The only decision Defendants cite, *Heeger v. Facebook, Inc.*, 2020 WL 7664459, at *7 (N.D. Cal. Dec. 24, 2020), did not purport to impose any such limitation on common law privacy claims, and is easily distinguishable because it involved only the mere collection of geolocation data.

<u>Third</u>, citing *Foglestrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 991-92 (2011), Defendants exaggerate the level of egregiousness required to support a claim, suggesting that it must rise to the level of something akin to the public disclosure of

"highly personal medical information." MTD at 32:25. That position is irreconcilable with the cases cited in Argument § III.A, *supra*. *Foglestrom* involved facts that were far less troubling than the facts here: the defendant simply sent mail to customers' homes after asking those customers for their zip codes. *Opperman I*, 87 F. Supp. 3d at 1060-61 (explaining *Folgestrom*). Defendants' own authority, *Opperman II*, distinguished *Folgestrom* in part because *Folgestrom* did not involve the "surreptitious theft of personal" information. *Id.* Contrary to Defendants' position here, the *Opperman* court declined to hold as a matter of law that the surreptitious acquisition of information qualified as unoffensive, "routine commercial behavior." *Id.*

Fourth, in arguing that their conduct was not egregious, Defendants once again ignore the standard governing 12(b)(6) motions by making factual assertions that "much of the information [QM gathers] is de-identified, pseudonymized, and/or encrypted." MTD at 33:12. QM declines to say what information this is, and the allegations (which again must be accepted as true) are that QM's claims of encryption are dubious. FAC ¶¶ 50-53. The bottom line, however, is that factual disputes cannot be resolved on the pleadings. Likewise, Defendants' argument that "**disclosure**" of information is necessary to support a common law invasion of privacy claim is inconsistent with the authorities cited in Argument § III.A, *supra*, and ignores the allegations that Plaintiff's information **was** disclosed to QM. FAC ¶ 4 (Plaintiff was unaware that her communications "were being intercepted in real-time and would be disclosed to QM"); *see also id.* ¶¶ 1, 33.

Fifth, none of the other opinions cited by Defendants involved facts that are anything close to the facts presented here. They either did not involve surreptitious data collection at all;[5] or involved materially less data collection such as geolocation

---

[5] *Hill*, 7 Cal. 4th at 35; *Fredenburg v. City of Fremont*, 119 Cal. App. 4th 408, 423 (2008); *Cabral v. Supple, LLC*, 2012 WL 12895825, at *3 (C.D. Cal. Oct. 3, 2012);

tracking, device types, or the amount of time spent on an app;[6] and/or involved facts where the plaintiffs agreed to the collection of information.[7]  *See also Opperman II*, 205 F. Supp. 3d at 1078-79 (analyzing and distinguishing several of the decisions Defendants cite here).

## IV.   *Khoja* And F.R.E. 208 Require Denial Of Defendants' Request For Judicial Notice

Citing the incorporation by reference doctrine, Defendants seek judicial notice of several documents to support various factual arguments asserted in their motion to dismiss.  But the fact that Defendants feel compelled to submit so many documents underscores how much their motion rests on disputed factual issues.  Regardless, three governing principles require denial of Defendants' request for judicial notice.  First, in *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018), the Ninth Circuit warned against "[t]he overuse and improper application of judicial notice and the incorporation-by-reference doctrine."  "[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Id.* at 1002.  "[I]f the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint.  Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims."  *Id.*

Second, judicial notice only permits a court to take notice of matters that are "not subject to reasonable dispute."  Fed. R. Evid. 201(b).  A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily

---

*Sheski v. Shopify (USA) Inc.*, 2020 WL 2474421, at *6 (N.D. Cal. May 13, 2020); *London v. New Albertson's Inc.*, 2008 WL 4492642, at *8 (S.D. Cal. Sept. 30, 2008).

[6] *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 199 (N.D. Cal. 2019); *In re: Zoom Video Commcn's Inc. Privacy Litig.*, 2021 WL 930623, at *15 (N.D. Cal. Mar. 11, 2021); *Heeger*, 2020 WL 7664459, at *7; *McCoy v. Alphabet, Inc.*, 2021 WL 405816 at *1; *In re iPhone Application Litig.*, 844 F. Supp. 2d at 1063.

[7] *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1031 (N.D. Cal. 2014); *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 985 (N.D. Cal. 2014).

determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)-(2).  None of these requirements are met with respect to Defendants' **interpretation** of the contents of the documents they submit.  Even if the Court took judicial notice of the existence of the documents, that would not permit judicial notice that Defendants' arguments concerning the contents of the documents are true.  *See*, *e.g.*, *Farrell v. Boeing Employees Credit Union*, 761 F. App'x 682, 684 n.1 (9th Cir. 2019) ("[W]e take judicial notice of the existence of the website in the public realm, but decline[] to notice that the contents of the website are true.").

Third, courts properly deny requests for judicial notice of irrelevant documents.  *See, e.g.*, *Santa Monica Nativity Scenes Cmte. v. City of Santa Monica*, 784 F.3d 1286, 1298 n.6 (9th Cir. 2015) (denying requests for judicial notice "on the grounds that the documents to be noticed are irrelevant"); *Plevy v. Haggerty*, 38 F.Supp.2d 816, 820-21 (C.D. Cal. 1998) (declining to take judicial notice of public records that were not relevant to motion to dismiss).

As set forth below, these three principles support denial of Defendants' request for judicial notice.

The Patents (Exhibits A and C): when Defendants moved to dismiss the original complaint, they attached two of QM's patents, and Plaintiff utilized that information to amend her complaint.  *See* ECF No. 19.  Now Defendants complain that "Plaintiff confusingly cites to two of Quantum's patents interchangeably," and cite the patents in support of a host of **factual** arguments disputing allegations about the patents the amended complaint.  MTD at 1:24-27, 5:21-27, 14:1-15:12. Defendants will have an opportunity to make all these arguments at summary judgment, after their assertions about QM's technology have been tested in expert discovery.  However, the patents are irrelevant here because Defendants only offer them to support factual arguments that are improper on a 12(b)(6) motion.

QM's Website (Exhibit B):  Defendants submit a screenshot of QM's own website (not lululemon.com), which is not referenced anywhere in the FAC, and

certainly does not "necessarily form the basis of the complaint." *Khoja*, 899 F.3d at 998. Plaintiff does not allege she visited QM's website or that she knew anything about the company. This document simply represents Defendants' improper effort to "insert their own version of events into the complaint." *Id.*

Lululemon's Privacy Policy and Check-Out Screen (Exhibits D-E): Judicial notice of these documents are governed by the rule that "if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint," and therefore is not subject to judicial notice. *Id.* at 1002. While the documents are referenced in the FAC, they are only relevant inasmuch as Defendants are relying on them to support a consent defense. Hence, the incorporation by reference doctrine does not apply. *See id.*

Random Blog About QM (Exhibit F): In their motion to dismiss, Defendants state the FAC includes a quote that Defendants claim came from Exhibit F. *See* MTD at 4:25. That is not a legal basis to treat the entire contents of a random internet blog as true. Further, the only reason Defendants cite Exhibit F is to quibble about whether the session recording is "a reconstruction" rather than a "recording," but they never argue the distinction makes a difference to the outcome of their motion. *See* MTD at 4:8. The document is therefore irrelevant.

## CONCLUSION

The Court should deny the motion to dismiss in its entirety. If the Court determines that the pleadings are deficient in any respect, Plaintiff respectfully requests leave to amend. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017) (lower court erred by denying leave to amend after dismissing amended complaint).

Dated: April 22, 2021          Respectfully submitted,

**BURSOR & FISHER, P.A**.

By:   */s/ Joel D. Smith*
             Joel D. Smith

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No.  244902)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          jsmith@bursor.com

*Attorneys for Plaintiff*